LOUIS R. HEAD, Plaintiff-Appellant, v. LUTHERAN GENERAL HOSPITAL, Defendant-Appellee.

First District (3rd Division)   No. 86—2792

Opinion filed November 25, 1987.

684

Donald T. Morrison & Associates, P.C. of Waukegan (Donald T. Morrison, of counsel), for appellant.

Cassiday, Schade & Gloor, of Chicago (Rudolf G. Schade, Jr., Michael J. Gallagher, and Judith A. Schieber, of counsel), for appellee.

JUSTICE WHITE delivered the opinion of the court:

Plaintiff Dr. Louis Head sued defendant Lutheran General Hospital for wrongful termination of his staff privileges. In count I of his third amended complaint plaintiff alleged that defendant failed to follow its bylaws in the termination proceedings; in count II he alleged that the proceedings were fundamentally unfair; and in count III he alleged that the decision to terminate his privileges was arbitrary and capricious. The trial court directed a verdict for defendant on count I, dismissed count II, and entered judgment on the jury's verdict in favor of defendant on count III. Plaintiff appeals.

Plaintiff, a chest surgeon, joined defendant's courtesy staff in 1959. As a member of the courtesy staff he was permitted to admit patients to the hospital, but unlike members of the attending staff he was not required to attend staff meetings and he could not vote on hospital affairs. He also joined the courtesy staffs of several other hospitals in the area in order to have enough work to sustain his practice as a chest surgeon. In 1969 plaintiff became a member of defendant's provisional staff due to a change in defendant's bylaws, retaining the privileges he had as a member of the courtesy staff. Under defendant's bylaws the credentials committee made recommendations concerning reappointment for all of defendant's staff members each year. In October 1975, the credentials committee recommended reappointment of plaintiff, but it also voted to monitor his records on an ongoing basis.

In February 1976, plaintiff asked a nurse to contact Dr. Charles Staley, who chaired the division of surgery, for consultation regarding a patient in intensive care. Staley told the nurse he was not able to consult on the case. Plaintiff made a note in the patient's chart stating that Staley refused to see the patient. On February 20, 1976, Staley wrote a letter to plaintiff objecting to the note in the patient's record, and asking plaintiff not to request any further consultations from him. Also on February 20, 1976, plaintiff received a letter from Dr. Morris Binder, who chaired the credentials committee, notifying plaintiff that the committee reviewed some "deficiencies" in plaintiff's records and decided to monitor his records on an ongoing basis. Plaintiff wrote an apology to Staley.

On April 6, 1976, plaintiff admitted D.S. into the hospital for surgery which was scheduled for April 8. On April 9, Staley sent a memo to Binder in which he said that plaintiff had not seen D.S. for two

weeks prior to his admission, and did not see him for two days after admission. The hospital scheduled the surgery for 3:30 p.m. on April 8, but Staley canceled the surgery when plaintiff failed to appear at the scheduled time. Plaintiff discharged D.S. from the hospital on April 9 without performing the surgery. Plaintiff sent a letter to the utilization review committee explaining that he wanted to discourage D.S. from undergoing the cosmetic surgery he requested, since plaintiff did not believe that the potential advantages were worth the risk. When he was initially unable to dissuade D.S., he agreed to admit him to the hospital. Plaintiff wanted D.S. to spend an extra day in the hospital before surgery because he suspected that D.S. was under the influence of various drugs. On April 9 he effectively persuaded D.S. not to undergo the surgery.

On May 25, 1976, Staley sent plaintiff a letter in which he criticized plaintiff for beginning a surgery one half hour late on May 19, 1976. Staley sent Binder a copy of the letter.

Plaintiff met with Binder on May 27, 1976. Binder criticized plaintiff for failing to see his patients and write progress notes with adequate frequency. Plaintiff drafted a memo summarizing the meeting and he sent a copy to Binder. Plaintiff wrote that

> "the Credentials Committee evaluates each doctor on the staff in reference to his attendance at hospital meetings, *** the number of times he sees [his] patient[s], and the number of times that he writes hospital record progress notes. *** I told Dr. Binder that complying with these artificial guidelines for the measurement of quality of medical care [was] not consistent with my principles of practice and that the problem would certainly continue and would probably only be resolved by a decision of the Medical Staff or Board of Directors.
> ***
> In my individual case I do think that there are possible solutions to the problem. One is to resign from the staff and the second is to be expelled from the staff. ***
> There is a third alternative which *** is to change my status from that of courtesy staff to one of consulting staff. *** It would require *** referring [patients] to other physicians chosen by me as their primary admitting doctor[s]."

On October 5, 1976, the credentials committee voted unanimously to recommend that the board of trustees not reappoint plaintiff. According to the bylaws, "In the event of an adverse Credentials Committee recommendation, the affected Member shall have the privilege of the floor at the meeting with the Attending Medical Staff which

considers that recommendation." Plaintiff requested from Binder a written statement of the charges against him to help him prepare his statement to the staff. Plaintiff testified at trial that Binder told him he was to "give a general statement *** about anything relative to the matter that [he] thought would be appropriate," but Binder did not tell him the charges. Binder testified that he told plaintiff that the charges were the same as the matters they discussed at their meeting on May 27, and he told plaintiff he had the privilege of responding to those charges at the medical staff meeting. He admitted that he did not supply a written list of charges.

At the staff meeting on November 16, 1976, plaintiff discussed in general terms his desire to remain on the staff. After the staff dismissed him from the meeting, it voted to recommend that plaintiff not be reappointed. The bylaws provide:

"Upon his receipt of notice of an adverse recommendation [by the Medical Staff] or upon his receipt of notice of an adverse decision [by the Board of Trustees], the affected Member shall have fifteen (15) days within which to deliver to the President a written request for a hearing before the Judicial Review Committee. *** Under no circumstances shall a member be entitled to more than one (1) hearing before the Judicial Review Committee each time reappointment is sought."

Plaintiff requested a hearing before the judicial review committee (JRC) and a written statement of the charges. The written statement specified five charges against plaintiff, which the JRC investigated in a five-hour hearing with plaintiff held on January 4, 1977. The JRC summarized its findings in a two-page report, in which it stated that the most important charge was that plaintiff did not meet "accepted standards of medical care *** with regard to frequency of patient visits." The JRC answered in its report:

"The committee carefully considered each of the records cited in this charge. The committee was unable to find any written or unwritten requirement with regard to frequency of patient visits and, therefore, attempted to apply a standard of reasonableness as dictated by the quality of medical care expected from a member of the Medical Staff of Lutheran General Hospital. There were a total of 33 charts which were reviewed by several members of the Medical Staff. Of these 33 charts, 16 were found to be OK and 3 were missing discharge summaries when reviewed and since these were present on the charts, these records were not further considered. Almost all of the remaining charts were reviewed. In each case, Dr. Head reviewed

the medical problem with the committee and pointed out that each case represented a long-term chronic illness and the need for therapy of a chronic type but necessary to be done in an acute care institution. In each case, Dr. Head asserted that his only failure was that of writing a progress note. In each case he maintained that there was at least daily telephone communication with the patient usually or a staff nurse occasionally to insure that there was no status change which would require a personal visit. The Medical Staff representative did not assert that any patient had been harmed by this procedure nor tha[t] any specific patient[']s hospital stay had been unnecessarily prolonged by this procedure. The committee did not express either approval or disapproval of this approach to patient care, but attempted to apply both individually and collectively the above described standard. \*\*\* [C]onsiderations of this charge probably formed the basis for each man's vote at the conclusion of the proceeding.''

The JRC recommended that defendant reappoint plaintiff to the staff, thereby reversing the staff's recommendation.

According to the bylaws:

"In the event of a recommendation, made by \*\*\* the Judicial Review Committee \*\*\* for:

a. The modification of an adverse recommendation, then the body which made the adverse recommendation shall vote again on the matter and forward its second recommendation to the Governing Body [*i.e.*, the Board of Trustees] which shall, upon receipt, take final action thereon;

b. The upholding of an adverse recommendation in all respects, then the Governing Body shall upon receipt of the recommendation take final action thereon \*\*\*.''

On March 15, 1977, the medical staff met to reconsider plaintiff's reappointment in light of the JRC report. The staff did not permit plaintiff to appear at the meeting. The staff voted to sustain its original recommendation to deny plaintiff staff privileges, thereby reversing the JRC's recommendation.

The board of trustees met on April 12, 1977. Binder attended and presented the recommendations of the credentials committee and the medical staff. The minutes of the meeting indicate that Dr. Donald Aaronson, who chaired the JRC, also attended the meeting. Binder had asked that one member of the JRC attend the board meeting in order to present that committee's recommendation. Aaronson testified at trial, in 1985, that he did not attend the board meeting. The

board did not allow plaintiff to attend the meeting. The board voted not to reappoint plaintiff to the staff. William Brown, who chaired the board of trustees, wrote a letter to plaintiff in which he stated that "[t]he Board of Trustees, at its meeting on April 12, 1977, reviewed the recommendations of the Attending Medical Staff, the Credentials Committee and the Judicial Review Committee" before voting to discontinue plaintiff's staff privileges.

Plaintiff filed his original one-count complaint in April 1979. In December 1984 plaintiff served interrogatories asking defendant to state the name, qualifications and opinion of its experts. Plaintiff filed his second amended complaint, also in one count, on March 6, 1986, the day before trial began. In section A of the complaint he sought damages for defendant's failure to follow the procedures set out in its bylaws; in section B he sought damages for defendant's "arbitrary and capricious" decision to terminate plaintiff's staff privileges, and for its failure to "afford plaintiff substantive due process." Plaintiff also filed a motion to bar the testimony of defendant's expert witness, Dr. John Porterfield, on grounds that defendant did not give plaintiff the notice required under Supreme Court Rule 220 (107 Ill. 2d R. 220) and because Porterfield's opinion lacked foundation. The trial court denied the motion.

Dr. Aaronson, plaintiff's first witness, testified concerning the JRC hearing. On cross-examination, he testified that he participated in drafting defendant's bylaws, and in his understanding the bylaws provide that "[i]f the Judicial Review Committee makes any modification of [an adverse recommendation] such as reversing it, then it would go back to the body that made the original adverse recommendation. If they don't make any modification *** and just uphold it, then there is one further appeal ***." He testified that the staff's recommendation on reconsideration following JRC review is then sent to the board of trustees for final decision.

During a break in the trial, plaintiff took Porterfield's deposition. He then moved for leave to file his third amended complaint in three counts. The trial court reserved the issue of whether to allow plaintiff to file the amended complaint.

Plaintiff's next witness, Dr. Marvin Firestone, an expert on hospital bylaws and the malicious deprivation of staff privileges, testified that each hospital's bylaws must comport with principles of fundamental fairness. Thus, when a hospital considers reducing the privileges of any staff member, it must send that member notice of the charges, it must allow the member to prepare and present a defense at a meaningful hearing before an unbiased tribunal, and it must give the mem-

ber the right to appeal the decision of the tribunal. Firestone testified that in his opinion, "modification," as it is used in the bylaws, means a change which leaves the decision basically adverse. Thus, because defendant's bylaws provided no further procedures after the JRC reversed the medical staff, the JRC's recommendation should have gone directly to the board of trustees, without any subsequent consideration by the medical staff. He concluded that defendant failed to follow its bylaws in the proceedings against plaintiff.

Firestone admitted that, if the term "modification" in the bylaws is interpreted to include a reversal, then defendant followed its bylaws in this case. However, he testified that under that interpretation the bylaws do not provide for fundamentally fair proceedings because the hearing before the JRC is then essentially meaningless: the JRC can offer only an advisory opinion. Since the final decision maker, the board of trustees, decided to discontinue plaintiff's staff privileges without directly hearing plaintiff's defense, in Firestone's opinion the proceedings were fundamentally unfair.

At the close of plaintiff's case, the trial court granted plaintiff's motion to file his third amended complaint, but it struck count II, which charged that defendant's acts were fundamentally unfair, for failure to state a cause of action. The court subsequently struck "all testimony produced by any party regarding whether the bylaws are flawed in providing fairness." The ruling apparently affected only part of Firestone's testimony. The court subsequently granted plaintiff leave to file a fourth amended complaint restating count I of the third amended complaint, which charged defendant with violating its bylaws, and stating as count II the charge from count III of the third amended complaint that defendant acted arbitrarily and capriciously.

Dr. Porterfield, an expert in hospital management and a former member of the Joint Commission on the Accreditation of Hospitals (JCAH), testified over plaintiff's objection that in his opinion defendant complied with its bylaws in the procedure by which it terminated plaintiff's privileges. Since the JRC did not uphold the medical staff's recommendation, its action constituted a modification of the staff's recommendation, within the meaning of the bylaws, and therefore the matter was properly sent back to the medical staff for a second vote after the JRC made its recommendation. He based his opinion in part on his work with the JCAH, where he participated in the development of guidelines for medical staff bylaws, although he thought that the JCAH Manual did not define "modification." He did not refer to any court decisions or bylaws of other hospitals in determining the meaning of "modification" in defendant's bylaws.

Dr. George Scholly, a member of defendant's staff, testified over plaintiff's objection that in 1976 he reviewed charts for 32 of plaintiff's patients, admitted in 1975 and 1976, to determine the frequency with which plaintiff visited each patient. The JRC subsequently reviewed the same charts, and these charts formed the principal evidence the JRC considered in plaintiff's case. Scholly's notes concerning the charts indicate that plaintiff failed to see nine of his patients for at least two consecutive days. Plaintiff made no note on the chart of one of his patients until two days after he admitted the patient; he made no note for three consecutive days on the charts of four patients, and for one patient he failed to note any visits for five consecutive days. One other patient was in the hospital for six weeks, and plaintiff failed to see that patient on 16 days during that stay.

At the close of the evidence both parties moved for directed verdicts. The court directed a verdict for defendant on count I, and it denied motions for directed verdict on the remaining count. Plaintiff asked the court to instruct the jury that it could find defendant's acts arbitrary and capricious if defendant's discharge of plaintiff was "not according to an established rule, standard or criteria, or which is fundamentally unfair." Instead, the court instructed the jury that it could find defendant's acts arbitrary and capricious if defendant discharged plaintiff "without fair, solid or substantial cause or reason."

On appeal plaintiff argues that the trial court erred in that it (1) denied plaintiff's motion for directed verdict and granted defendant's motion for directed verdict on count I; (2) struck and dismissed count II of plaintiff's third amended complaint; (3) denied plaintiff's motion for directed verdict on count III of the third amended complaint and entered judgment on the jury's verdict for defendant on that count, contrary to the manifest weight of the evidence; (4) refused plaintiff's proposed instruction; and (5) admitted testimony from Porterfield and Scholly, but struck part of Firestone's testimony.

I

Plaintiff contends that the trial court should have granted its motion for a directed verdict on count I because defendant violated its bylaws when it sent the JRC's recommendation back to the medical staff for a further vote instead of sending the recommendation directly to the board of trustees.

■■ ■ Defendant's staff forms a voluntary association whose bylaws form part of the contract between the association and its members. (*Perkaus v. Chicago Catholic High School Athletic League* (1986), 140 Ill. App. 3d 127, 133, 488 N.E.2d 623.) "Questions of con-

tractual \*\*\* interpretation are matters of law for the court to decide \*\*\*." (*Northern Illinois Construction Co. v. Zale* (1985), 136 Ill. App. 3d 822, 824, 483 N.E.2d 1013.) Although the parties presented conflicting testimony regarding the proper interpretation of the bylaws, there was substantial agreement regarding the actions which defendant took and the procedures it utilized in discharging plaintiff. Therefore we find that the trial court appropriately chose not to allow the jury to decide upon the disposition of count I.

■■ The court must construe each provision of a contract in light of its other provisions (*Board of Trade v. Dow Jones & Co.* (1983), 99 Ill. 2d 109, 122, 456 N.E.2d 84), and in view of the scope and purpose of those provisions (*In re Estate of Klinker* (1979), 80 Ill. App. 3d 28, 30, 399 N.E.2d 299). Defendant's bylaws establish that a doctor is entitled to a hearing before the JRC whenever the medical staff votes to recommend a reduction in the doctor's staff privileges. Defendant granted plaintiff's request for such a hearing, and it gave plaintiff a list of the charges against him. The JRC heard evidence both for and against plaintiff. Members of the medical staff and the board of trustees received copies of the JRC's report which both summarized its findings of fact and stated its recommendation that defendant reappoint plaintiff to the staff, reversing the staff recommendation.

Defendant sent the JRC recommendation back to the medical staff for further consideration. Although the bylaws specify procedures to follow when the JRC upholds or modifies a staff recommendation, there is no separate provision which details the procedures to follow after the JRC reverses a staff recommendation. Aaronson, who helped write defendant's bylaws, and Porterfield both interpreted "modification" in the bylaws to include reversal, and thus they testified that defendant followed its bylaws in this case. Firestone testified that reversal was not a kind of modification, and he believed that in the absence of any express provision for reversals, defendant should have sent the JRC recommendation directly to the board of trustees. Plaintiff introduced into evidence a dictionary definition of modification under which reversal could not be considered a kind of modification.

■■ The bylaws expressly provide that the JRC's recommendation is sent directly to the board of trustees whenever that recommendation is the same as the recommendation of the entire medical staff. The bylaws further provide that the JRC recommendation must be reconsidered by the medical staff whenever the JRC recommends a modification of the staff recommendation. The staff must then reconsider its original recommendation in light of the evidence adduced at

the hearing before the JRC. However, in either case the bylaws require the concurrence of a majority of the medical staff in any recommendation before the recommendation, along with the relevant evidence, is presented to the board of trustees. The JRC, comprised of eight members of the medical staff, can make no recommendation which binds the entire staff. In these circumstances we find that the trial court properly concluded that the JRC's reversal of the staff recommendation was a kind of "modification" of the recommendation, as "modification" is used in the bylaws. Since defendant followed its bylaws when it sent the JRC recommendation to the staff for further consideration, we find that the trial court correctly granted defendant's motion for directed verdict on count I.

## II

Plaintiff argues that the trial court erred when it struck and dismissed count II of this third amended complaint. Plaintiff alleged in count II that defendant acted in a fundamentally unfair manner because it did not afford him the right to be heard at each step of the process, it did not provide him a written list of charges before the meeting at which he spoke to the staff, and he was not allowed to appeal from the staff's final recommendation or the board's decision.

■ Defendant is a private institution, and its medical staff is a voluntary association. In *Virgin v. American College of Surgeons* (1963), 42 Ill. App. 2d 352, 192 N.E.2d 414, this court stated that "[c]ourts annul expulsions from voluntary associations when they are *** contrary to rudimentary due process or natural justice." (42 Ill. App. 2d at 369.) However, voluntary associations do not need to accord their members all of the due process protections provided in the Federal Constitution. *Siqueira v. Northwestern Memorial Hospital* (1985), 132 Ill. App. 3d 293, 299, 477 N.E.2d 16.

Plaintiff's memorandum regarding his meeting with Binder on May 27, 1976, indicates that he was aware of the general nature of the charges against him well before the meeting at which he addressed the medical staff. The lack of a formal, written charge at that point does not amount to a deprivation of fundamental rights. Plaintiff received a formal written statement of charges before the JRC's fact-finding hearing, and he had adequate time to prepare and present a defense.

■ In *Siqueira* the defendant hospital summarily suspended Dr. Siqueira's privileges and he requested a hearing before an *ad hoc* committee. The committee held a full fact-finding hearing, and it recommended lifting the suspension. The hospital board of directors

rejected the recommendation and decided to suspend Dr. Siqueira indefinitely. The court found that the hospital had not deprived Dr. Siqueira of his right to due process, since the hospital held a fact-finding hearing, and the hearing committee's recommendation was subject to review by the medical executive committee and the board of directors. (132 Ill. App. 3d at 299-300.) In the instant case defendant's bylaws require essentially the same procedures, and following *Siqueira* we hold that these procedures adequately comport with the requirements of fundamental fairness. Although plaintiff could recover if defendant violated its bylaws or acted arbitrarily and capriciously, on the facts stated in his complaint, he has no separate cause of action for violation of principles of fundamental fairness. We find that the trial court properly struck count II of the third amended complaint.

### III

Plaintiff next claims that the trial court should have granted his motion for a directed verdict on count III of the third amended complaint because defendant acted arbitrarily and capriciously when it rejected the JRC's recommendation. We disagree. Although the board was bound to accept the JRC's findings of fact, it was not bound to accept its recommendation. (*Siqueira*, 132 Ill. App. 3d at 300.) The JRC found that in one year plaintiff either failed to see or failed to make chart notations for 10 of his patients for at least two consecutive days and he failed to record any contact with one patient for five consecutive days. The JRC found that these 10 cases involved long-term chronic illnesses, plaintiff said that for all 10 cases he contacted either the patient or the nurse by telephone every day, and the staff did not show that any patient had been harmed by the omissions. The JRC also heard evidence that plaintiff sometimes delayed filling out discharge summaries for substantial periods of time, and it heard evidence regarding D.S., the patient whom plaintiff finally discouraged from undergoing elective surgery after a three-day hospital stay during which plaintiff failed to appear for surgery at the scheduled time.

The JRC found that defendant had no published standard for frequency of patient visits or for writing progress notes, so it applied a standard of reasonableness to evaluate plaintiff's behavior. In the judgment of the majority of members of the JRC, plaintiff's actions were not unreasonable. The medical staff applied its own judgment to the JRC's findings of fact, and it decided to recommend that plaintiff not be reappointed to the staff, showing that a majority of its members felt that plaintiff's conduct was unreasonable.

Plaintiff asserts that the staff and the board were not entitled

to rely on their own information in arriving at their decisions. However, as plaintiff conceded at oral argument, there is no indication in the record that either the staff or the board considered any evidence not presented to the JRC. The board stated in its letter to plaintiff that it considered the JRC report and the recommendations of the medical staff and the JRC. The board chose to accept the staff recommendation, evidently agreeing with the staff's judgment that plaintiff's acts were unreasonable. On the basis of the evidence in the JRC report, we cannot say that the board's decision was arbitrary and capricious. The trial court correctly denied plaintiff's motion for directed verdict on that count of his complaint. Similarly, we cannot say that the jury verdict was contrary to the manifest weight of the evidence.

## IV

■ Plaintiff contends that the trial court instructed the jury to apply an inappropriate definition of "arbitrary and capricious." Plaintiff proposed the following instruction:

> "When I use the term 'arbitrary and capricious', I mean an action or omission which is not according to an established rule, standard or criteria, or which is fundamentally unfair."

The court refused the instruction and instead told the jury:

> "When I use the term 'arbitrary and capricious', I mean an action or omission which is without fair, solid or substantial cause of reason."

Both plaintiff and the court based their instructions on the definition of "arbitrary" given in Black's Law Dictionary (5th ed. 1979), page 96, which states that an act is arbitrary when it is done "[w]ithout adequate determining principle; *** not done or acting according to reason or judgment ***. Without fair, solid, and substantial cause; *** not governed by any fixed rules or standard." In his proposed instruction plaintiff goes beyond the dictionary definition in an effort to reintroduce the issue of fundamental fairness, which the court properly excluded from this case. Plaintiff also sought to focus the jury's attention on the fact that defendant had no written standard for frequency of patient visits and for writing progress notes. In the absence of a written standard, the JRC, the medical staff, and the board of trustees all applied a standard of reasonableness to evaluate plaintiff's actions. Courts have long applied a standard of reasonableness to evaluate behavior, and the fact that people can disagree on the application of this standard to certain cases does not render the decisions based on this standard arbitrary. Similarly, the fact that the board and

the staff disagreed with the JRC's application of the reasonableness standard to the defendant's acts does not render the board's decision arbitrary. We find that plaintiff's proposed instruction would have unfairly focused attention on the lack of a written standard in this case; the instruction which the court gave is a fair summary of the law.

## V

Finally, plaintiff contends that the trial court committed prejudicial error when it permitted Dr. Porterfield and Dr. Scholly to testify and when it struck part of Dr. Firestone's testimony. Firestone testified that the procedures defendant afforded plaintiff were fundamentally unfair. We have held that the trial court correctly removed that issue from the case, and therefore Firestone's testimony pertaining to that count was also properly stricken. Insofar as Firestone's testimony was relevant to the issue of whether defendant followed its own bylaws, plaintiff was not prejudiced by the striking of the testimony because the court correctly decided that issue without assistance from the jury. The court did not strike Firestone's testimony in support of the charge that defendant acted arbitrarily and capriciously. When the court struck part of Firestone's testimony, it told the jury to disregard "all testimony produced by any party regarding whether the bylaws are flawed in providing fairness." This manner of describing the stricken testimony assured that the jury would not be prejudiced against plaintiff by the fact that the testimony was stricken. We find that plaintiff was not prejudiced by the trial court's decision to strike part of Firestone's testimony.

Scholly testified concerning the review of plaintiff's charts which he performed in 1976. Since Scholly's review formed an important part of the evidence before the JRC, the medical staff, and the board of trustees, it was highly relevant to a determination of whether the board's action was arbitrary and capricious. Therefore the trial court properly admitted Scholly's testimony into evidence.

Plaintiff maintains that Porterfield's testimony should have been excluded because defendant failed to comply with Supreme Court Rule 220. That rule requires the parties to disclose their expert witnesses at the later of either the first pretrial conference or 90 days after the party who seeks to present an expert knows the substance of his opinion. (107 Ill. 2d R. 220(b)(1)); *Fischer v. G & S Builders* (1986), 147 Ill. App. 3d 168, 171, 497 N.E.2d 1022.) The record on appeal contains no indication of the date on which defendant disclosed Porterfield to plaintiff, nor does the record indicate the date of any pretrial conferences. Therefore, on the basis of this record we cannot

say that the trial court erred in its decision not to bar Porterfield due to the alleged violation of Supreme Court Rule 220.

■■■ Plaintiff also maintains that Porterfield's testimony should have been barred because he stated at his deposition that he based his opinion regarding the meaning of the bylaws on "common knowledge." At trial he explained that he based his opinion in part on his work for JCAH on guidelines for hospital bylaws, even though he did not base his opinion on any specific publication of JCAH or on any court opinions. We hold that the trial court did not abuse its discretion in allowing Dr. Porterfield to testify as an expert. *Hardware State Bank v. Cotner* (1973), 55 Ill. 2d 240, 250, 302 N.E.2d 257.

For the reasons stated above we affirm the trial court decisions directing a verdict for defendant on count I of plaintiff's third amended complaint, striking count II, and entering judgment on the jury verdict for defendant on count III.

Affirmed.

McNAMARA, P.J., and RIZZI, J., concur.