WILLIAM McMAHON, Plaintiff-Appellant, v. CHICAGO MERCANTILE EXCHANGE, Defendant-Appellee.

First District (4th Division)   No. 1—90—1542

Opinion filed November 14, 1991.

Tenenbaum & Senderowitz, of Chicago (Stephen J. Senderowitz and Ellen Barron Feldman, of counsel), for appellant.

Freeman, Freeman & Salzman, P.C., of Chicago (Jerrold E. Salzman and Scott R. Williamson, of counsel), for appellee.

JUSTICE LINN delivered the opinion of the court:

Plaintiff, William McMahon, brought an action in the circuit court of Cook County against defendant, the Chicago Mercantile Exchange (Exchange). Plaintiff sought a declaration determining his rights under an Exchange membership program, and damages for tortious interference with business opportunity and breach of contract.

At the close of a bench trial, the court entered judgment for the Exchange. Plaintiff appeals, assigning error to the trial court's findings and judgment.

We affirm the judgment of the trial court.

BACKGROUND

I

The parties agree on most of the trial court's findings of fact. To better understand plaintiff's claims, those findings included a review of the Exchange and its rules, and of the Exchange's membership rights program.

A

The Chicago Mercantile Exchange is regulated by the Commodity Futures Trading Commission (CFTC) pursuant to the Commodity Exchange Act. (See generally 7 U.S.C. §1 *et seq.* (1988).) The Exchange and its several divisions serve as an exchange for the trading of futures and options contracts.

The Exchange is governed by the Board of Governors (Board). The Board may adopt, alter, amend, or repeal Exchange rules, except where the rulemaking power is reserved to Exchange members via referendum. Exchange rules govern the number of Exchange members and the expansion of memberships; requirements for membership; conduct, fees, and dues of members; and the sale and transfer of memberships with their accompanying rights and interests.

Only Exchange members may trade on the Exchange floor. The extent of a person's trading rights depends on the type of membership that the trader holds. To become an Exchange member, a person must acquire a membership, must be found qualified and eligible by the Exchange, and must be elected to membership by the Board of Governors.

B

A person may buy a membership pursuant to the requirements and procedures under Exchange Rules 103 through 110. During 1981 through 1985, a person could have acquired a membership also by participating in the Exchange's membership rights program. The program was designed in part to expand Exchange membership by 25% during the four-year period. The program was approved by the Board of Governors and adopted by Exchange members on April

28, 1981. The program became effective when it was approved by the CFTC on July 27, 1981.

The program created dividends labelled "Membership Rights" (MRs). The MRs were issued to owners of Exchange memberships on a *pro rata* basis on the date of the program's adoption, April 28, 1981. These MRs could then be sold or leased. Each MR entitled the holder to a prescribed amount or level of trading privileges. The holder of multiple MRs gained additional trading privileges. If a person accumulated four MRs in the same division of the Exchange, he would receive, upon application, a full Exchange membership.

For example, on April 28, 1981, the Exchange's international monetary market division had 650 members. On that date, the Exchange issued one MR to each member and auctioned an additional two MRs in the division. As a result, the monetary market had a total of 652 MRs, which could ultimately be combined into 163 full memberships, *i.e.*, an increase of 25%.

The Exchange created a "Membership Rights Committee" (MR Committee) to oversee the program. The committee could investigate matters, and advise and assist the Board, in connection with the program. However, neither the MR Committee nor the Exchange's membership department could alter or amend the MR program's rules. Such power, as was generally the case, was vested in the Board of Governors or reserved for Exchange members.

Exchange Rules 151 through 153 governed the requirements for MR applicants, transfers of MRs, and the ultimate conversion of MRs to full memberships. Rule 151 provided that an MR applicant had to meet the same requirements as an applicant for an Exchange full membership, and was subject to all applicable Exchange rules. Rule 152 provided that MRs could be sold or transferred privately among members, but only in accordance with Exchange rules for the sale or transfer of full memberships, specifically including the posting of the transaction and, in case of a sale, the deposit of the proceeds with the Exchange. Rule 153 provided that once four MRs were combined to create a full membership, the MRs were cancelled.

Under the Exchange's bid and offer procedure, an MR holder who wished to sell an MR could submit a formal offer to the membership department. The offer stated the price at which he would sell. Conversely, a member who wished to buy an MR could submit a formal bid to the membership department. The bid stated the price at which he would buy. The bid must have been guaranteed by

a clearing member of the Exchange, or a certified or cashier's check must have been deposited with and made payable to the Exchange for the full purchase price.

The membership department posted on its office bulletin board the amount of the highest bid to buy, the amount of the lowest offer to sell, and the most recent price of an MR sold between members through the auction process. The membership department matched the bids and offers submitted. When an agreement or "match" occurred between a bid and an offer, the department would notify the buyer and the seller.

Within two business days of notification of a match, the buyer of an MR or full membership must deposit a transfer fee with the Exchange. The buyer must also deposit, if he did not do so earlier, the full purchase price. The buyer must then apply for membership. Until the application and payment requirements are met, the buyer cannot receive the privileges attached to the MR.

The MR program did not include a means to force or ensure the conversion of the final MRs at the program's conclusion. An MR holder was on notice that his MR would expire worthless if not combined with three others by the close of the program.

As stated earlier, the Exchange adopted the MR program and issued MRs on April 28, 1981. In anticipation of approval by the CFTC, the Exchange distributed MRs to membership owners in May 1981. Beginning May 12, the Exchange allowed MRs to be bought or transferred and began the process of qualification for new memberships.

The CFTC approved the MR program on Thursday, July 23, 1981. The next day, the Exchange reported to its members that the program had received Commission approval, and that all qualified MR holders could begin trading on Monday, July 27. Exchange Rule 154 set the MR program term as follows: "MRs shall expire four years from the issuance date unless sooner converted into Exchange memberships." The rule identified Monday, July 27, 1981, as the effective date of the program; the Exchange interpreted this date to be the "issuance date" for determining the program's final day. The date that fell "four years from" Monday, July 27, 1981, was Saturday, July 27, 1985. The Exchange was not open for business on that day; nor was it open on any Saturday, Sunday, or holiday during the program's term.

Prior to the expiration of the MR program, the MR committee notified all Exchange members and MR holders that the program would end on Friday, July 26, 1985, at the close of business at 5

p.m. The notice further stated that all MRs would expire worthless at that time, unless sooner converted into full memberships. Notice of the program's termination date appeared in several sources: an Exchange publication since May 1, 1984; weekly membership postings since April 1, 1985; letters dated June 10, 1985, sent by registered mail to MR holders; and in special executive reports since June 21, 1985. It is undisputed that plaintiff received notice of the MR program's termination date.

## II

In the case at bar, plaintiff owns a full membership in the Exchange's international monetary market division. Thus, on or about May 7, 1981, he received one MR. During this time of MR distribution, neither Brian Elliott nor Charles Howard owned a membership; thus, neither received an MR from the Exchange. During this time, Elliott leased a membership. In September 1981, Elliott bought a full membership in the monetary market. In November 1982, Charles Howard bought an MR for $53,000 and, in January 1983, was elected to membership, entitling him to trade.

Approximately four years elapsed from plaintiff's receipt of his first MR. On July 14, 1985, twelve days prior to the expiration of the MR program, plaintiff bought a second MR for $37,000. On July 18, plaintiff submitted to the Exchange two formal bids to buy two MRs for $36,000 apiece. On Wednesday, July 24, one of these bids matched.

As a result of these transactions, on Thursday, July 25, 1985, the day before the last day of the MR program, only four monetary market MRs remained that had not been converted into a full membership. Plaintiff held three MRs and had extended a formal bid to buy a fourth for $36,000. Charles Howard held the remaining MR. For several months, he had extended a formal offer to sell his MR for $40,000.

On Thursday morning, July 25, Susan Bergquist of the Exchange staff telephoned plaintiff at his home and suggested that he negotiate with another MR holder to acquire a fourth MR. She did not reveal Howard's identity to plaintiff. Bergquist telephoned Howard on another line, and relayed the bids and offers between plaintiff and Howard. The negotiation proceeded until Howard offered to sell at $37,000 and plaintiff bid to buy at $36,000. At that time, plaintiff stopped the telephone negotiation so that he could travel to the Exchange's office.

On Thursday afternoon, plaintiff arrived at the membership department's office. Department staff gave to plaintiff Howard's name and telephone number, and informed plaintiff that he and Howard were the sole remaining MR holders. Likewise, Exchange personnel gave to Howard plaintiff's name and telephone number, and informed Howard that plaintiff had three MRs. The membership department told plaintiff to negotiate directly with Howard.

On Thursday afternoon, plaintiff and Howard negotiated directly via telephone. They disagree on what transpired. Plaintiff testified that he and Howard eventually agreed on a purchase price of $37,000, but that Howard had "deferred final negotiation" until the following day. Howard, however, testified that they did not agree on a purchase price; Howard offered to sell at $37,000, but plaintiff bid only $35,000. Howard then bid $35,000 for each of plaintiff's three MRs. Plaintiff refused and repeated his bid of $35,000 for Howard's MR. Howard refused; plaintiff hung up.

On Friday, July 26, 1985, the last day of the MR program, Howard privately sold his MR to Brian Elliott for $40,000. The sale was documented; Elliott applied for a membership and had the sale guaranteed as Exchange rules required. Howard was paid pursuant to the contract.

Elliott submitted to the membership department a formal offer to sell his MR for $60,000. The department contacted plaintiff and informed him of Elliott's offer to sell; plaintiff rejected the offer. The positions of plaintiff and Elliott were reflected by the membership department's formal postings on Friday, July 26, 1985: Elliott's offer to sell his MR for $60,000; plaintiff's bid to buy an MR, raised from $35,000 on Thursday to $37,000 on Friday morning, and lowered to $36,500 by Friday afternoon; plaintiff's offer to sell each of his MRs for $38,000; and Elliott's bid to buy three MRs for $25,000 apiece.

The membership department arranged a meeting between plaintiff and Elliott at its offices prior to 5 p.m. Present at the meeting were MR committee chairperson Michael Savoca, and committee staff members Susan Bergquist and Paula Voigt. Elliott arrived at the meeting at approximately 4:30 p.m.; plaintiff arrived at approximately 4:50 p.m. Savoca advised plaintiff and Elliott that the Exchange's official clock would determine when 5 p.m. arrived. It is undisputed that everyone in the room acted with the knowledge that the MR program would end at 5 p.m. After some negotiation, plaintiff bid $38,000 for Elliott's MR, or, alternatively, offered to sell his three MRs to Elliott for the same price. Elliott rejected

plaintiff's bid and offer. Plaintiff and Elliott did not reach an agreement by 5 p.m. Consequently, the four MRs, not being combined, expired worthless.

On Monday, July 29, 1985, Elliott went to the membership department's office and stated that he would buy plaintiff's three MRs for $38,000 apiece. Plaintiff agreed to sell at this price. The department prepared the paperwork, which included a request to the Exchange's Board of Governors to waive the termination provisions of the MR program. It was necessary to obtain the Board's waiver before plaintiff and Elliott could make the sale. The evidence is controverted regarding whether plaintiff returned his completed forms to the membership department on that Monday, or the next day, Tuesday, July 30. However, it is undisputed that Elliott did not obtain a guarantor's signature until Tuesday, July 30.

On August 7, 1985, the Exchange's Board of Governors denied the request of plaintiff and Elliott to waive the MR program's termination date. The Board subsequently denied their request for reconsideration.

On May 15, 1987, plaintiff filed in the trial court a complaint against the Exchange; on February 28, 1989, he filed a three-count amended complaint. In count I, plaintiff sought a declaration determining his rights under the MR program.

In count II, plaintiff sought damages for tortious interference with prospective business opportunity. He alleged that the Exchange interfered with his "opportunity to purchase Charles Howard's MR at $37,000 and thereafter prevented that purchase from being consummated by acquiescing in and permitting Brian Elliott to demand $60,000 for the last MR of Charles Howard on the last day of the MR program as declared by the [Exchange]."

In count III, plaintiff sought damages for breach of contract. Plaintiff claimed that the Exchange's rules constituted a contract between him and the Exchange. He alleged several instances where the Exchange breached the contract.

The trial court denied cross-motions for summary judgment and held a bench trial. On April 27, 1990, the trial court entered judgment for the Exchange. The court found, *inter alia*, that the Exchange properly terminated the MR program on Friday, July 26, 1985; that plaintiff and Howard never matched at $37,000; and that even if the program should have concluded on Monday, July 29, plaintiff and Elliott did not complete a sale because Elliott's forms were not completed in accordance with Exchange rules. The trial court also found that plaintiff failed to prove that the Exchange

tortiously interfered with his prospective business opportunity. Plaintiff appeals.

OPINION

I

■ Plaintiff assigns error to the trial court's conclusion that the Exchange properly terminated the MR program on Friday, July 26, 1985. We state at the outset the underlying legal principles. It is quite settled that a stock or commodity exchange has the power to adopt and enforce reasonable rules to govern its members, including the admission of members and the control of business transactions between members. The constitution and rules of an exchange constitute a contract between all members of the exchange with each other and with the exchange itself. Even in the absence of an express, written consent to be bound by an exchange's rules, every exchange member impliedly consents to be so governed by virtue of his admission and by his acceptance of the benefits of membership. Consequently, an exchange's constitution and rules are binding on members and in their dealings with each other. (*Brown v. Gilligan, Will & Co.* (S.D.N.Y. 1968), 287 F. Supp. 766, 769 (and authorities cited therein); *Fayette Tobacco Warehouse Co. v. Lexington Tobacco Board of Trade* (Ky. App. 1957), 299 S.W.2d 640, 642-43; 73 Am. Jur. 2d *Stock & Commodity Exchanges* §7 (1974); 33 C.J.S. Exchanges §§3, 10(b) (1942); C. Meyer, The Law of Stockbrokers & Stock Exchanges §7 (1931).) Illinois courts have long recognized these principles. *Board of Trade v. Nelson* (1896), 162 Ill. 431, 438-39, 44 N.E. 743, 745; *Geldermann, Inc. v. Stathis* (1988), 177 Ill. App. 3d 414, 418-19, 532 N.E.2d 366, 368.

A

■ Plaintiff initially contends that, as a matter of law, the MR program did not terminate until Monday, July 29, 1985. He points to section 1.11 of "An Act to revise the law in relation to the construction of the statutes," which states as follows:

"§1.11. The time within which any act provided by law is to be done shall be computed by excluding the first day and including the last, unless the last day is Saturday or Sunday or is a holiday ***, and then it shall also be excluded. If the day succeeding such Saturday, Sunday or holiday is also a holiday or a Saturday or Sunday then such succeeding day

shall also be excluded." (Ill. Rev. Stat. 1985, ch. 1, par. 1012.)

Plaintiff argues that since the MR program's termination date fell on Saturday, July 27, 1985, the statute shifted the termination date to Monday, July 29.

■ We cannot accept plaintiff's argument. Although the statute provides a general rule to compute time, it does not apply to all situations. The parties to a contract are free to include any terms they choose, as long as those terms are not against public policy or do not contravene some positive rule of law. Such a contract is binding on both parties, and it is the duty of a court to construe and enforce the contract as made. *Nabor v. Occidental Life Insurance Co.* (1979), 78 Ill. App. 3d 288, 292, 396 N.E.2d 1267, 1270-71, citing *Soucie ex rel. Ziems v. Illinois Agricultural Mutual Insurance Co.* (1944), 323 Ill. App. 456, 462-63, 56 N.E.2d 55, 58-59; accord *A.A. Conte, Inc. v. Campbell-Lowrie-Lautermilch Corp.* (1985), 132 Ill. App. 3d 325, 329, 477 N.E.2d 30, 33.

■ It is true that, *in the absence of language to the contrary*, a court considers laws and statutes in existence at the time a contract is executed as part of the contract as though they were expressly incorporated therein. The existing laws, statutes, and ordinances become implied terms of the contract as a matter of law. "By entering into such an agreement, *and by not specially excluding or modifying the effects of the various laws*, the contracting parties are deemed to have accepted these laws as part of their agreement." (Emphasis added.) (*S&D Service, Inc. v. 915-925 W. Schubert Condominium Association* (1985), 132 Ill. App. 3d 1019, 1023, 478 N.E.2d 478, 483.) The time computation statute is one such law that could be construed as an implied term of a contract. (See *Providence Insurance Co. v. La Salle National Bank* (1983), 118 Ill. App. 3d 720, 724, 455 N.E.2d 238, 241.) Indeed, the application of such a statute to a contract is generally approved, when the contract does not give a different meaning or plainly show a different intention. 86 C.J.S. *Time* §14(10), at 897 (1954).

■ In the case at bar, however, the MR committee did specially exclude the effect of the time computation statute on the contract at issue, *i.e.*, the MR program. The committee announced that the program would end on Friday, July 26, 1985, at the close of business at 5 p.m. We hold that the MR committee's announcement was sufficient to exclude the effect of the time computation statute on the MR program.

Pursuing this contention, plaintiff argues that the exchange failed to follow its own procedures in terminating the MR program on Friday, July 26, 1985. Plaintiff also argues that the Exchange, by terminating the program on Friday, breached the contract between him and the Exchange. In support of these arguments, plaintiff points to the following uncontested facts: the MR committee announced the program's termination date; the committee lacked the power to create, alter, or amend the program's rules; and that such power was vested in the Exchange's Board of Governors or reserved for Exchange members.

The trial court held that when the MR committee set the program's termination date at Friday, July 26, 1985, the committee did not alter or amend the MR program's rules, or otherwise engage in *ultra vires* rulemaking. Rather, the court concluded that the committee simply interpreted the program's duly enacted rules, which the committee was indisputably empowered to do.

■ We agree. Of course, the termination date of the MR program required interpretation. As Professor Williston explained:

> "The fact that a contract has been put into express words does not prevent the meaning and legal operation of those words from being affected by their factual [operation]: *** [L]anguage, though seemingly plain and clear, will not bear a literal interpretation if this leads to an absurd result ***." (4 S. Williston, Williston on Contracts §610B, at 533 (3d ed. 1961).)

In the case at bar, the rules of the MR program provided that the program would end on Saturday, July 27, 1985. Since the Exchange is closed on Saturdays, a literal reading of the program rules would have led to an absurd result.

■ We further conclude that the MR committee was empowered to interpret the program rules to avoid the absurd result. "If there is a reasonable doubt of the meaning of the rules the exchange will be permitted to construe them, although the exchange may not say that they import something different from their obvious meaning." (Meyer, *The Law of Stockbrokers & Stock Exchanges* §7, at 85 (1931).) Since the program rules did not have an "obvious meaning" regarding the program's termination date, the MR committee was empowered to construe them. It is quite settled that courts allow exchanges discretion in interpreting the meaning of exchange rules. (*Shultz v. Securities & Exchange Comm'n* (7th Cir. 1980), 614 F.2d 561, 571 (and cases cited therein).) Therefore, we uphold the trial court's conclusions that the MR committee properly

set the MR program's termination date at Friday, July 26, 1985, and that by so doing, the Exchange did not breach its contract with plaintiff.

**B**

Plaintiff further contends that the Exchange deprived him of due process when it set the MR program's termination date at Friday, July 26, 1985. Plaintiff argues that the Exchange's action deprived him of his right to buy or sell MRs up to "the last minute of the last day of the fourth year of the program."

■■ The trial court concluded that the Exchange accorded plaintiff due process and we agree. Although the Exchange's action may have affected plaintiff's economic and property interests, thereby triggering due process protections, it is settled that "voluntary associations [need not] accord their members all of the due process protections provided in the Federal Constitution." (*Head v. Lutheran General Hospital* (1987), 163 Ill. App. 3d 682, 693, 516 N.E.2d 921, 928, citing *Siqueira v. Northwestern Memorial Hospital* (1985), 132 Ill. App. 3d 293, 299, 477 N.E.2d 16, 20-21.) Rather, a voluntary association must simply treat its members in accordance with its rules and rudimentary due process, *i.e.*, the association must act fairly and impartially, and without denial of essential rights. *Siqueira*, 132 Ill. App. 3d 293, 477 N.E.2d 16; *Rosee v. Board of Trade* (1976), 43 Ill. App. 3d 203, 236, 356 N.E.2d 1012, 1034.

■■ In the case at bar, plaintiff indisputably received notice of the Friday, July 26, 1985, termination date. Further, plaintiff received a hearing before the Board of Governors pursuant to his request to waive the termination date. We conclude that the Exchange accorded plaintiff adequate due process.

We additionally note that the trial court alternatively found that even if the MR program should have terminated on Monday, July 29, 1985, plaintiff and Elliott did not complete a sale on that date because Elliott's forms were not completed in accordance with Exchange rules. The evidence was controverted whether plaintiff completed the required forms by Monday, July 29. However, it was undisputed that Elliott did not obtain a guarantor's signature until Tuesday, July 30. Although plaintiff assigns error to this finding, we need not address this issue because we have concluded that the MR program was properly terminated on Friday, July 26, 1985.

Further, if we did address this issue, it would suffice to note that the Monday transaction between plaintiff and Elliott was not

an absolute and unconditional contract to be fulfilled under all circumstances. Rather, their agreement was subject to the rules and requirements of the Exchange and of the Exchange's Board of Governors. This condition, therefore, became an integral part of their agreement. See *Thomson v. Thomson* (1925), 315 Ill. 521, 529-30, 146 N.E. 451, 455; accord Meyer, *The Law of Stockbrokers & Stock Exchanges* §28, at 171-72 (1931).

However, plaintiff counters with the argument that the Exchange waived compliance with the termination date by accepting the required forms from plaintiff and Elliott on Monday, July 29, 1985. This argument lacks merit. Of course, the Exchange did not waive compliance with the termination date. Indeed, the paperwork that the Exchange accepted from plaintiff and Elliott included a signed, formal request to the Exchange's Board of Governors to waive the termination date. This formal request to the Board to waive the termination date is quite inconsistent with plaintiff's present argument. (See *Nelson v. Union Wire Rope Corp.* (1964), 31 Ill. 2d 69, 115, 199 N.E.2d 769, 794.) It cannot logically be argued that the Exchange's mere acceptance of the paperwork constituted a waiver of the termination date, when that paperwork included a written request that the Board grant that exact waiver, which the Board subsequently denied. We agree with the trial court that since plaintiff and Elliott did not meet all of the Exchange's requirements by Monday, July 29, 1985, then they did not complete a sale prior to the expiration of the MR program.

## II

Plaintiff next assigns error to the trial court's conclusion that he failed to prove that the Exchange tortiously interfered with his prospective business opportunity. We initially note our standard of review. Especially in cases involving contradictory evidence, the trial judge, sitting as the trier of fact, is in a position superior to a reviewing court to observe the conduct of the witnesses while testifying and to determine their credibility, and to weigh the evidence and determine the preponderance thereof. A reviewing court will not set aside these determinations because the trial court believed or credited one group of witnesses and did not credit the other group. We may not overturn a judgment merely because we might disagree with it or might, had we been the fact finder, have come to a different conclusion. *Commonwealth Edison Co. v. Department of Revenue* (1989), 179 Ill. App. 3d 968, 975, 535 N.E.2d 30, 35.

As a result of these principles, a reviewing court will not disturb a trial court's findings unless they are against the manifest weight of the evidence. A finding is against the manifest weight of the evidence when an opposite conclusion is clearly apparent. Indeed, we have held that it will not suffice to show that the record will support a contrary decision; rather, we will affirm if the record contains any evidence to support the trial court's judgment. *Trident Industrial Products Corp. v. American National Bank & Trust Co.* (1986), 149 Ill. App. 3d 857, 865, 501 N.E.2d 273, 279-80; *Tomaso v. Plum Grove Bank* (1985), 130 Ill. App. 3d 18, 23, 473 N.E.2d 588, 592.

■■■ The tort of interference with prospective advantage or business opportunity is closely allied with the tort of interference with contractual relations. Both torts "recognize that a person's business relationships constitute a property interest and as such are entitled to protection from unjustified tampering by another." (*Belden Corp. v. Internorth, Inc.* (1980), 90 Ill. App. 3d 547, 551, 413 N.E.2d 98, 101.) The elements of the tort are: (1) the plaintiff has a reasonable expectancy of entering into a business relationship; (2) the defendant knows of the expectancy; (3) the defendant interferes and prevents the realization of the business relationship; and (4) the defendant's interference actually damages the plaintiff. (*Bank Computer Network Corp. v. Continental Illinois National Bank & Trust Co.* (1982), 110 Ill. App. 3d 492, 500, 442 N.E.2d 586, 592; *Belden*, 90 Ill. App. 3d at 552, 413 N.E.2d at 101-02.) In the case at bar, the trial court found that plaintiff failed to prove the third and fourth elements: that the Exchange purposely interfered with and defeated plaintiff's business expectancy, *i.e.*, his efforts to either buy an MR or sell his three MRs; or that the Exchange actually harmed him.

■■■ In his appellate brief, plaintiff alleges five instances where the Exchange interfered with his business expectancy. First, plaintiff alleges that the Exchange "abandoned its rules" by disclosing to Howard that plaintiff held the three remaining MRs, "thereby allowing a squeeze [*sic*] to occur." The trial court found that plaintiff could not point to any rule that the Exchange violated by disclosing the information to Howard. Second, plaintiff alleges that the Exchange interfered with his business expectancy when it forced him to deal directly with Howard. The trial court found that Exchange rules permitted private transfers of MRs. Additionally, no one forced plaintiff to negotiate with Howard; plaintiff could have refused. Third, plaintiff alleges that the Exchange refused to "con-

summate" the sale between him and Howard when plaintiff agreed to pay Howard's offer of $37,000 on Thursday, July 25, 1985. The trial court found that plaintiff and Howard never matched that Thursday, either at the Exchange offices or in their subsequent private negotiation. The record contains evidence to support the trial court's findings, and we cannot say that opposite conclusions are clearly apparent.

Plaintiff fourthly alleges that the Exchange interfered with his business expectancy when it failed to adopt a "fail-safe plan *** to ensure full conversion of all remaining MRs" at the conclusion of the MR program. The trial court found that the Exchange had no such duty. We agree. There is no private cause of action for damages against an exchange for its failure to amend its rules. See *Sam Wong & Son, Inc. v. New York Mercantile Exchange* (2d Cir. 1984), 735 F.2d 653, 666-70.

Plaintiff fifthly alleges that the Exchange failed to prevent "the illegal price manipulation," or "squeeze," by Elliott. The trial court correctly found that this allegation failed for several alternative reasons. The trial court found, *inter alia*, that the Exchange's failure to prevent the alleged squeeze did not violate the pertinent section of the Commodity Exchange Act (see 7 U.S.C. §7 (1988)); that an MR was not a commodity; and that it was equally as necessary for Elliott to deal with plaintiff as it was for plaintiff to deal with Elliott. (See generally *Cargill, Inc. v. Hardin* (8th Cir. 1971), 452 F.2d 1154; *Apex Oil Co. v. DiMauro* (S.D.N.Y. 1989), 713 F. Supp. 587, 601-03.) We uphold the trial court's determination that plaintiff did not prove his claim of tortious interference with prospective economic advantage.

## III

Plaintiff lastly claims that the Exchange breached its contract with him on various occasions. He alleged that: (1) the Exchange breached the contract by terminating the MR program on Friday, July 26, 1985, instead of Monday, July 29; (2) the Exchange imposed a "punishment" not prescribed by the rules by denying "his right to redeem his MRs"; (3) the Exchange breached its bid and offer procedure by failing to "consummate" the agreement between himself and Howard; and (4) the Exchange breached "its obligations to prevent manipulation, squeezing, and illiquidity of markets" by knowingly permitting these activities to occur.

Plaintiff initially argues that the trial court failed to address his breach of contract claim. We disagree. It was not necessary for the

trial court to specially address plaintiff's breach of contract claim. A trial court need not make any findings of fact, and the failure to make a specific finding is not a ground for reversal. Rather, in reviewing a judgment, we will assume that all issues and controverted facts were found in favor of the prevailing party. The question before us is not whether the trial court made a specific finding, but whether its final determination is supported by the evidence. *Nemeth v. Banhalmi* (1984), 125 Ill. App. 3d 938, 959, 466 N.E.2d 977, 992.

In the case at bar, a cursory review of the allegations contained in plaintiff's breach of contract claim reveals that the trial court had addressed all of them in the context of his other claims. Referring to his second allegation, we repeat that plaintiff's "right" to redeem his MRs was subject to the rules of the Exchange. As a result, plaintiff's failure to comply with those rules simply precluded a sale and did not constitute a punishment. Additionally, our disposition of plaintiff's contentions obviates the need to discuss his arguments regarding damages.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

JIGANTI, P.J., and McMORROW, J., concur.