Louis RUBIN, Plaintiff,

v.

Stanley O. IKENBERRY, Morton Weir, Robert Berdahl, P. David Pearson, Theodore Manolakes, and Brian Braun, Defendants.

No. 92–1160.

United States District Court, C.D. Illinois, Peoria Division.

May 29, 1996.

Charles S. Watson, Feldman & Wasser, Springfield, IL, for plaintiff.

Michael R. Cornyn, Thomas, Mamer & Haughey, Champaign, IL, for defendants.

## ORDER

MIHM, Chief Judge.

Before the Court is Defendants' Motion for Summary Judgment [# 19]. For the reasons set forth below, the Motion is GRANTED.

### Background

The facts of this case are voluminous and will be summarized in their most skeletal form. Plaintiff, Louis Rubin ("Rubin"), is a tenured professor in the College of Education of the Urbana–Champaign campus of the University of Illinois ("University"). (Amended Complaint ("Complaint"), ¶ 3.) Defendants are Stanley O. Ikenberry (President of the University system), Morton Weir (Chancellor of the Urbana–Champaign campus of the University), Robert Berdahl (Vice Chancellor for Academic Affairs of the Urbana–Champaign campus of the University), P. David Pearson (Dean in the College of Education of the University), and Theodore Manolakes (Associate Dean in the College of Education and Acting Department Head of the Department of Instruction and Curriculum of the Urbana–Champaign campus of the University). *Id.,* ¶¶ 4–8. Defendant Brian Braun, the husband of one of the grievants in the sexual harassment proceeding giving rise to this lawsuit, was dismissed with prejudice on November 24, 1993. (Minute Entry, 11/24/93, granting Motion to Voluntarily Dismiss.)

In January 1990, Rubin was teaching "Methods of Teaching Social Studies in the Elementary Schools," Elementary Education 345 (Complaint, ¶ 20.) The class consisted of 33 students, all of whom were female. *Id.,* Exh. G. On January 29, 1990, two students, Terre Braun and Kathy Anderson, filed sexual harassment grievances against Rubin on account of his sexual commentary, inquiries, and jokes during class. *Id.,* Exh. C. Rubin does not deny making the offending comments; rather, he maintains that when they are evaluated in the proper context, they are pedagogically correct. (Response to Reply, p. 3.)

A copy of Braun's grievance is attached to the Complaint, which alleges that Anderson's

grievance is "substantially similar." (Complaint, ¶ 39.) Rubin received a copy of the grievances the same day. *Id.,* ¶ 37, Exh. C; Rubin Dep., p. 51. He also received notice of a January 30, 1990 meeting to which he was invited to bring counsel. (Complaint, ¶ 42; Rubin Dep., Exh. 1.) He attended without counsel. (Complaint, ¶ 46.) Present at that meeting were Defendants Pearson and Manolakes and Steven Veasie, University legal counsel at the Champaign–Urbana campus of the University. *Id.,* ¶ 49. The parties dispute the extent to which Rubin had the opportunity to explain himself at that time. *Id.,* ¶¶ 50–51; Memo. in Opp., p. 4 (stating that Rubin was given only "an opportunity to give brief reasons for having made the statements" that he made); *contra* Manolakes Dep., pp. 132–34; Ken Anderson Dep., p. 57; Veasie Dep., pp. 78–80.

Rubin was relieved from teaching Elementary Education 345 with two of four weeks of the course remaining. (Complaint, ¶ 57.) On January 31, 1990, Rubin thanked Berdahl and other university officers by letter for allowing him to explain his teaching approach and to express his regret over the problem he had caused. (Rubin Dep., Exh. 3.) He also wrote that the assignment of a different professor to the remainder of the course was most appropriate. *Id.*

On February 27, 1990, Manolakes communicated in writing to each grievant his conclusion that she had been sexually harassed and that her grievance was granted in accordance with the terms of his letter. (Rubin Dep., Exhs. 4, 5.) A February 27, 1990 letter from Pearson to Rubin gives no indication that there had been a ruling on the grievances, nor does the attached February 26, 1990 letter from Manolakes to Pearson. (Rubin Dep., Exh. 6.)

In a March 7, 1990 letter to Pearson, Rubin wrote that he had "learned today that the students' grievance was granted on February 27, or thereabouts." (Rubin Dep., Exh. 7.) On March 8, 1990, Rubin requested from Manolakes, among other items, a copy of the letter granting the grievances. (Rubin Dep., Exh. 8.) On March 27, 1990, Rubin wrote Manolakes that "in my March 8 correspondence, I requested copies of your letter

to the student complainants acknowledging sexual harassment." (Def. Exh. 6, filed 11/3/92.) Rubin now alleges that "he did not know that [Manolakes' letters] included a finding that the grievants had been sexually harassed." (Complaint, ¶ 81.)

On March 12, 1990, Rubin signed a letter written by Manolakes incorporating some of the findings and recommendations of the University's team which had investigated the situation. (Complaint, Exh. I.) This letter does not mention the status of the grievances and specifically makes no reference to Manolakes' letters to the grievants. On March 30, 1990, Rubin's counsel wrote Manolakes that Rubin's "previous letters to you are to be taken as an appeal of [your] finding of sexual harassment." (Rubin Dep., Exh. 11.)

The University *Handbook of Policies and Regulations* contains a section entitled "University of Illinois Statement on Sexual Harassment" which defines sexual harassment as:

> [A]ny unwanted sexual gesture, physical contact, or statement that a reasonable person would find offensive, humiliating, or any interference with his or her required tasks or career opportunities at the University.

(Complaint, Exh. A.) This section also states that sexual harassment is not tolerated, sanctions will be imposed on a case-by-case basis, and the University will respond to every report of sexual harassment. *Id.*

According to the Complaint, the *University of Illinois Statutes* concerning academic freedom state that:

> a. It is the policy of the University to maintain and encourage full freedom, *within the law,* of inquiry, discourse, teaching, research, and publication and to protect any member of the academic staff against influences, from within or without the University, which would restrict him in the exercise of these freedoms in his area of scholarly interest.

(Emphasis added.) *Id.,* ¶ 11.

According to the Complaint, the *Academic Staff Handbook,* in the section entitled "Academic Freedom and Faculty Responsibility," states that:

Academic freedom is essential to the functioning of a university. It applies to its teaching, research and public service and involves both the faculty and students.

\* \* \* \* \* \*

Faculty are expected to teach their assigned courses in a manner consistent with the scheduled time, course content, and course credit as approved by the faculty. *Within these constraints,* they are entitled to freedom in the classroom in developing and discussing—according to their areas of competence—the subjects that they are assigned.

(Emphasis added.) *Id.,* ¶ 12.

### Discussion

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "The moving party is entitled to a judgment as a matter of law [when] the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

As to the factual aspect, a defendant's motion for summary judgment must demonstrate, based on the record, an absence of evidence to support the plaintiff's case. *Id.* "[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986); Fed.R.Civ.P. 56(e). The Court draws all justifiable inferences in favor of the non-movant. *Anderson,* 477 U.S. at 253–55, 106 S.Ct. at 2513.

As a preliminary matter, two counts of the Complaint are no longer viable. Count IX is a federal claim alleging a First Amendment free speech violation. On August 6, 1993, the Court granted summary judgment as to Count IX, which was stricken with prejudice. (Order, 8/6/93, p. 1.)

Count XXVI is an intentional infliction of emotional distress claim against Defendant Braun. On November 24, 1993, Braun was dismissed with prejudice. (Minute Entry, 11/24/93, granting Motion to Voluntarily Dismiss.)

Rubin alleges jurisdiction based on 28 U.S.C. §§ 1331, 1343 "as the action is predicated on 42 U.S.C. § 1983 and § 1988" and on pendent jurisdiction for the state claims. (Complaint, ¶ 1.) The Court finds jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367(a).

### I. Counts of the Complaint

#### A. *Substantive Due Process Counts*

Nine counts of the Complaint allege violations of substantive due process. Each alleges a violation of substantive due process with respect to a liberty interest in some other alleged right.

Three of the nine, Counts IV, V, and VI, are federal claims. Count IV alleges a violation of substantive due process of Rubin's liberty interest in First Amendment free speech. Count V replaces free speech with academic freedom. Count VI alleges a liberty interest in academic freedom created by state law.

The remaining six substantive due process claims are state claims. Counts XIII, XIV, and XV allege liberty interests in free speech, academic freedom, and academic freedom created by state law. They request declaratory and injunctive relief. Counts XXI, XXII, and XXIII make corresponding claims to XIII, XIV, and XV, but they request damages.

#### B. *Procedural Due Process Counts*

Nine counts of the Complaint allege violations of procedural due process. Each alleges a violation of procedural due process with respect to a liberty interest in some other alleged right.

Three of the nine, Counts I, II, and III, are federal claims. Count I alleges a violation of procedural due process of Rubin's liberty interest in First Amendment free

speech. Count II replaces free speech with academic freedom. Count III alleges a liberty interest in academic freedom created by state law.

The remaining six procedural due process counts are state claims. Counts X, XI, and XII allege liberty interests in free speech, academic freedom, and academic freedom created by state law. They seek declaratory and injunctive relief. Counts XVIII, XIX, and XIX make corresponding allegations but seek damages.

### C. *Non Due Process Counts*

The six remaining counts do not allege any violation of due process. Two are federal claims. Count VII alleges a violation of Rubin's First Amendment rights, and Count VIII adds academic freedom to Count VII. Four are state claims. Counts XVI and XXIV allege a violation of Rubin's right to free speech, and Counts XVII and XXV allege a violation of Rubin's right to academic freedom. The lower-numbered count in each pair is a claim for declaratory and injunctive relief; the higher-numbered count is a claim for damages.

## II. Substantive Due Process Counts

### A. *Federal Claims for Substantive Due Process Violations*

■ Only laws affecting fundamental rights come within the scope of substantive due process. *National Paint & Coatings Ass'n v. City of Chicago,* 45 F.3d 1124, 1129 (7th Cir.), *cert. denied,* — U.S. ——, 115 S.Ct. 2579, 132 L.Ed.2d 829 (1995). Fundamental rights are "among those fundamental principles of liberty and justice which lie at the base of all our civil and political institutions." (Internal quotation marks omitted.) *Kraushaar v. Flanigan,* 45 F.3d 1040, 1047 (7th Cir.1995). They are enumerated in the Constitution or are "so fundamental in our society that a state may not unjustly take

them away." *Taahira W. by McCord–Salley v. Travis,* 908 F.Supp. 533, 537 (N.D.Ill. 1995); accord *Kraushaar,* 45 F.3d at 1047.

■ Substantive due process insulates these fundamental rights from unjustified governmental intrusions. *Reno v. Flores,* 507 U.S. 292, 301–03, 113 S.Ct. 1439, 1447, 123 L.Ed.2d 1 (1993); *Kraushaar,* 45 F.3d at 1047; *Gosnell v. City of Troy, Ill.,* 59 F.3d 654, 657 (7th Cir.1995). The government may not "infringe certain 'fundamental' liberty interests *at all,* no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." (Emphasis in original.) *Reno,* 507 U.S. at 302, 113 S.Ct. at 1447. Therefore, substantive due process analysis begins with a careful description of the asserted right and an inquiry as to whether it is fundamental. *Id.*

■ The Supreme Court recently held that:

Where a particular amendment [to the Constitution] provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.

(Internal quotation marks omitted.) *Albright v. Oliver,* 510 U.S. 266, 273, 114 S.Ct. 807, 813, 127 L.Ed.2d 114 (1994) (plurality opinion). In other words, if a constitutional amendment exists to restrict the ability of the government to intrude upon personal liberties in an unjustified way, then that constitutional amendment provides the appropriate analytical framework for a complaint. *Id.; National Paint,* 45 F.3d at 1129. Substantive due process alone can offer a claimant no relief. *Albright,* 510 U.S. at 275–77, 114 S.Ct. at 814. Substantive due process is an inappropriate substitute for constitutional analysis where the Constitution directly addresses a subject. *Johnson v. Phelan,* 69 F.3d 144, 146 (7th Cir.1995).[1]

---

1. *Albright* was decided on January 24, 1994. *Albright,* 510 U.S. at 266, 114 S.Ct. at 807. A Seventh Circuit decision from February 18, 1994, suggests that a claim alleging a substantive due process violation based on the right to free speech is viable, without citing *Albright. Lawshe v. Simpson,* 16 F.3d 1475, 1479 (7th Cir.1994).

In *Lawshe,* the Seventh Circuit offered the following:

"But consider how [a ruling by the Supreme Court] would affect a substantive due process claim against a state official who allegedly violated an employee's right to free speech by firing him. Such an action would be possible

In *Albright*, the petitioner argued that the respondent had "deprived him of substantive due process under the Fourteenth Amendment—his 'liberty interest'—to be free from criminal prosecution except upon probable cause." *Albright*, 510 U.S. at 269, 114 S.Ct. at 810–11. The Supreme Court held that the petitioner's claim must be brought under the Fourth Amendment and not as a violation of substantive due process. *Id.*, at 273–75, 114 S.Ct. at 813.

■ In the present case, Rubin argues that Defendants deprived him of substantive due process by violating his liberty interest in his First Amendment rights to free speech. (Complaint, Count IV.) The First Amendment confers fundamental rights. *McIntyre v. Ohio Elections Com'n*, —— U.S. ——, —— n. 1, 115 S.Ct. 1511, 1514 n. 1, 131 L.Ed.2d 426 (1995); *Marshall v. Allen*, 984 F.2d 787, 798 (7th Cir.1993). Rubin's substantive due process violation allegation functions as a repeat claim of a First Amendment violation. The petitioner in *Albright* could not argue under the rubric of substantive due process instead of the applicable constitutional amendment. Rubin may not present a First Amendment argument as a substantive due process violation. Accordingly, Defendants' Motion for Summary Judgment is GRANTED as to Count IV.

■ Count V alleges a liberty interest in First Amendment academic freedom. Academic freedom falls within the parameters of the First Amendment and is a special concern of the First Amendment. *University of Pa. v. E.E.O.C.*, 493 U.S. 182, 194–99, 110 S.Ct. 577, 585–87, 107 L.Ed.2d 571 (1990); *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 226–27, 106 S.Ct. 507, 514, 88 L.Ed.2d 523 (1985); *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 2759–60, (1978). Academic freedom does not tolerate that which "casts a pall of orthodoxy over the classroom" which is the "'marketplace of ideas.'" *Keyishian v. Board of Regents*, 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967).

■ Academic freedom is not an independent First Amendment right. *Bishop v. Aronov*, 926 F.2d 1066, 1075 (11th Cir.1991), *cert. denied, sub nom Bishop v. Delchamps*, 505 U.S. 1218, 112 S.Ct. 3026, 120 L.Ed.2d 897 (1992). The term academic freedom is equivocal. *Piarowski v. Illinois Community College Dist. 515*, 759 F.2d 625, 629 (7th Cir.), *cert. denied*, 474 U.S. 1007, 106 S.Ct. 528, 88 L.Ed.2d 460 (1985). As a type of speech, academic freedom receives some protection from governmental abridgment by the First Amendment. *Id.* Deference to this right is appropriate. *Knight v. State of Ala.*, 14 F.3d 1534, 1552 (11th Cir.1994).

■ Academic freedom refers to the freedom of university professors and the university administrators to function autonomously, without interference from the government. *Piarowski*, 759 F.2d at 629; *Osteen v. Henley*, 13 F.3d 221, 225–26 (7th Cir.1993); *Ross v. Creighton Univ.*, 957 F.2d 410, 414–15 (7th Cir.1992). It also refers to the freedom of individual teachers to not suffer interference by the administrators of the university. *Piarowski*, 759 F.2d at 629; *Keen v. Penson*, 970 F.2d 252, 257 (7th Cir. 1992). These two freedoms can come into conflict. *Piarowski*, 759 F.2d at 629; *Keen*, 970 F.2d at 257. The academic institution enjoys a position of supremacy in addressing curriculum content. *Keen*, 970 F.2d at 257. Academic freedom does not license uncontrolled expression which is detrimental to the institution's proper functioning. *Id.*

■ If Count V is a restated First Amendment claim, it fails as a matter of law under *Albright*, as Count IV did. If Count V is an academic freedom claim, it fails because academic freedom, while an extremely important right, is not a "fundamental right" as is required for a right to receive substantive due process protection. *National Paint*, 45 F.3d at 1129. Academic freedom is a "spe-

because the First Amendment has been incorporated into the Fourteenth Amendment *as a liberty interest.*"
*Id.* at 1479–80 (emphasis in original) (stated in the context of an allegation of deprivation of property without due process); *accord Little v.*

*State of Ill. Dep't of Revenue*, 907 F.Supp. 280, 284 (N.D.Ill.1995) (quoting *Lawshe* in the context of a § 1983 claim). The Court notes that neither side makes any reference to *Albright*, *Lawshe* or *Little.*

cial concern" of the First Amendment. *See Reno*, 507 U.S. at 301–03, 113 S.Ct. at 1447; *National Paint*, 45 F.3d at 1129. By contrast, substantive due process protection is reserved for "matters relating to marriage, family, procreation, and the right to bodily integrity." *Albright*, 510 U.S. at 272, 114 S.Ct. at 812. Thus, Defendants' Motion for Summary Judgment is GRANTED as to Count V.

■■■ Count VI alleges a liberty interest in academic freedom as created by state law, specifically the Illinois Constitution. (Response to Reply, p. 3.) Substantive due process protects fundamental rights enumerated in the Constitution and other unenumerated "significant interests" that usually relate "to marriage, family, procreation, and the right to bodily integrity." *Kraushaar*, 45 F.3d at 1047; *Albright*, 510 U.S. at 272, 114 S.Ct. at 812. A liberty interest in a state-created right to academic freedom is neither an enumerated fundamental right nor anything like the other unenumerated significant interests which would indicate that it deserves substantive due process protection. *See Kraushaar*, 45 F.3d at 1047. Thus, academic freedom as created by state law is not protected under the substantive due process rubric.

■■■ Furthermore, "the Supreme Court has never held that such state-created interests constitute a fundamental liberty interest protected under a *substantive* due process theory. Rather, the Court has analyzed state-created liberties under a *procedural* due process theory." *Id.* (emphasis in original); *accord Robinson v. Howell*, 902 F.Supp. 836, 843 (S.D.Ind.1995). State law is not a proper starting point from which to determine whether conduct is reasonable under the federal Constitution. *Kraushaar*, 45 F.3d at 1047.

Accordingly, as a matter of law, this claim fails, and Defendants' Motion for Summary Judgment is GRANTED as to Count VI.

### B. *State Claims for Substantive Due Process Violations*

Rubin argues that he has stated substantive due process claims because his claims include allegations of other substantive constitutional rights (citing *Kauth v. Hartford Ins. Co. of Ill.*, 852 F.2d 951, 958 (7th Cir. 1988) (dealing with a property interest)) and because Defendants deprived him of his liberty interests in an arbitrary and capricious manner. (Complaint, ¶¶ 184, 189, 194.) Rubin then states that, "Much of what the grievants complained of could be considered sexual harassment under **any** stretch of the imagination," which seems counterintuitive. (Emphasis in original.) (Memo. in Opp., p. 6.)

Defendants contend that Manolakes' decision was not arbitrary and capricious and is supported by the record: Rubin's uncontested statements, the investigation team's report, Manolakes' own education, his 30 years of experience teaching (including teaching Elementary Education 345), and his knowledge of the student grievants. (Memo. in Supp., pp. 7–9.) Defendants further argue that this Court's review of that decision should be deferential. *Id.*

Rubin does not argue a denial of an interest protected absolutely by substantive due process. *Dennis E. v. O'Malley*, 256 Ill. App.3d 334, 628 N.E.2d 362, 373–74, 194 Ill.Dec. 865, 876–77 (1993). The focus is not on a state statute. *Brown v. Dep't of Pub. Aid*, 274 Ill.App.3d 410, 654 N.E.2d 582, 589, 211 Ill.Dec. 120, 127 (1995), *result abrogated by Jacobson v. Dep't of Pub. Aid*, 171 Ill.2d 314, 664 N.E.2d 1024, 216 Ill.Dec. 96 (1996), (stating that where a fundamental right is at stake, "there must be a compelling State interest to justify significant interference by a statute [which] must be narrowly drawn" and that strict scrutiny applies); *Messenger v. Edgar*, 157 Ill.2d 162, 623 N.E.2d 310, 316, 191 Ill.Dec. 65, 71 (1993) (stating that, absent a fundamental right, the rational basis test applies). Instead, the parties agree that the issue is whether Manolakes' decision was arbitrary and capricious. (Memo. in Supp., pp. 7–10; Response, p. 6.) Defendants argued, and Rubin did not disagree, that this issue is distinct from an inquiry as to whether the Court approves of Manolakes' decision. (Memo. in Supp., pp. 8–9.)

■■■ Under Illinois substantive due process case law, a defendant's action is arbi-

trary and capricious when "a rational relationship between the punitive action taken and legitimate disciplinary objectives behind the sanction" is lacking. *Myre ex rel. Myre v. Board of Educ.*, 108 Ill.App.3d 440, 439 N.E.2d 74, 83, 64 Ill.Dec. 145, 154 (1982) (Alloy, J., dissenting); *see also Korf v. Ball State Univ.*, 726 F.2d 1222, 1228–29 (7th Cir.1984) (stating, in the context of a federal substantive due process claim, that a professor's termination was not arbitrary where the reasons for it were adequate). Phrased differently, the inquiry is whether the defendant's actions result in punishment having no reasonable relationship to the objectives sought. *Hamer v. Board of Educ.*, 66 Ill. App.3d 7, 383 N.E.2d 231, 234, 22 Ill.Dec. 755, 758 (1978) (stating this inquiry in the context of a property right).

There is a dearth of Illinois law interpreting substantive due process claims based on arbitrary and capricious decision making. One decision states that this claim was made in the original complaint, but there is no mention of it in the court's discussion of the third amended complaint. *Head v. Lutheran General Hosp.*, 163 Ill.App.3d 682, 516 N.E.2d 921, 925, 114 Ill.Dec. 766, 770 (1987). In another, the plaintiff argued that a defendant's actions were arbitrary and capricious because he had no authority to investigate and sanction the plaintiff, but the analysis of this allegation was not published. *Zielinski v. Schmalbeck*, 269 Ill.App.3d 572, 646 N.E.2d 655, 657, 207 Ill.Dec. 89, 91 (1995).

 This Court's task is to identify the disciplinary objectives behind Manolakes' decision, determine their legitimacy, and assess whether they are rationally related to his finding. *Myre*, 439 N.E.2d at 83, 64 Ill.Dec. at 154; *cf. In re C.E.*, 161 Ill.2d 200, 641 N.E.2d 345, 353, 204 Ill.Dec. 121, 129 (1994), *cert. denied, sub nom C.E. v. Illinois Dep't of Mental Health and Developmental Disabilities*, —— U.S. ——, 115 S.Ct. 1956, 131 L.Ed.2d 848 (1995) (stating the need to balance an individual's liberty with the demands of an organized society). Providing an academic environment conducive to learning is a legitimate objective. Controlling potentially offensive and inappropriate sexually-related comments by a professor to a class is also a legitimate objective.

Social Studies Methods is a mandatory, preparatory class for teaching elementary-age children. The grievants alleged, and other students in the class confirmed, that Rubin asked his students whether they were engaged or married, would prefer a husband who was successful or a great lover, believe in abortion, would prefer the body or mind of a 30–year–old, would teach about love-making, believe in dispensing birth control devices in the schools, and would cook breakfast in the nude on request from their husbands. (Complaint, Exhs. C, D.) The investigative team did not ask the other students in the class about all of the comments mentioned in the grievances. *Id.*

 It is this Court's obligation to decide the issue as the Illinois Supreme Court would, were it presented with the case. *Todd v. Societe Bic*, 21 F.3d 1402, 1405 (7th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 359, 130 L.Ed.2d 312 (1994). The Court finds that there is a rational relationship between a finding of sexual harassment and the University's objective of providing students with a healthy learning environment. This is not a separate and independent finding by this Court that Rubin's comments and conduct constitute sexual harassment. Rather, it is a ruling that Manolakes' findings bear a reasonable relationship to the University's disciplinary objective of maintaining a desirable classroom atmosphere.

Accordingly, Defendants' Motion for Summary Judgment is GRANTED as to Counts XIII, XIV,[2] XV, XXI, XXII, and XXIII.

### III. Procedural Due Process Claims

#### A. Federal Procedural Due Process Claims

 When government action deprives a person of life, liberty, or property, the deprivation must be implemented in a fair man-

---

2. Counts XV and XXIII are duplicative of Counts XIV and XXII. Since both sets of counts allege state claims, Plaintiff is alleging a liberty interest in a state-created right to academic freedom twice.

ner. *United States v. Salerno,* 481 U.S. 739, 746–47, 107 S.Ct. 2095, 2101, 95 L.Ed.2d 697 (1987). Courts rely on a two-step test to guide their determinations whether a procedural due process violation has occurred. *Kentucky Dept. of Corrections v. Thompson,* 490 U.S. 454, 459–61, 109 S.Ct. 1904, 1908, 104 L.Ed.2d 506 (1989); *Kraushaar,* 45 F.3d at 1048–49.

 The first question is whether there is a liberty interest to trigger a constitutional violation when a plaintiff is deprived of that interest absent adherence to fair procedures. *Thompson,* 490 U.S. at 459–61, 109 S.Ct. at 1908; *Kraushaar,* 45 F.3d at 1048. Absent a liberty interest there can be no procedural due process violation. *Thompson,* 490 U.S. at 459–61, 109 S.Ct. at 1908; *Wroblewski v. City of Washburn,* 965 F.2d 452, 457 (7th Cir.1992). Liberty interests arise under the due process clause of the Fourteenth Amendment or under state law, by a statute or a binding administrative regulation. *Thompson,* 490 U.S. at 459–61, 109 S.Ct. at 1908; *Rowe v. DeBruyn,* 17 F.3d 1047, 1051 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 508, 130 L.Ed.2d 416 (1994). Liberty interests are based on substantive rather than procedural rights. *Olim v. Wakinekona,* 461 U.S. 238, 249–51, 103 S.Ct. 1741, 1748, 75 L.Ed.2d 813 (1983); *Smith v. Shettle,* 946 F.2d 1250, 1254 (7th Cir.1991).

 If the first question yields a positive response, the second question is whether there was proper process—fair procedures such as notice and the opportunity to be heard. *Kraushaar,* 45 F.3d at 1049; *see Wolff v. McDonnell,* 418 U.S. 539, 588, 94 S.Ct. 2963, 2990, 41 L.Ed.2d 935 (1974); *Hudson v. Chicago Teachers Union Local No. 1,* 743 F.2d 1187, 1192–93 (7th Cir.1984), *aff'd,* 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986). The procedural protections required by the due process clause are derived from balancing the following factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and

the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976); *Kraushaar,* 45 F.3d at 1049. The hearing must be meaningful and appropriate to the nature of the case. *Bell v. Burson,* 402 U.S. 535, 541–43, 91 S.Ct. 1586, 1591, 29 L.Ed.2d 90 (1971).

### 1. *Is there a liberty interest?*

 The first inquiry is whether any of Rubin's alleged liberty interests triggers constitutional protection. The "range of interests protected by procedural due process is not infinite." *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 570, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). The inquiry is satisfied not by looking to the weight but by looking to the nature of the interest alleged. (Emphasis omitted.) *Id.,* at 569–72, 92 S.Ct. at 2705–06. Liberty is more than freedom from bodily restraint; liberty denotes the right "to enjoy those privileges long recognized as essential to the orderly pursuit of happiness by free men." (Internal quotation marks omitted.) *Id.,* at 572, 92 S.Ct. at 2706–07. A liberty interest does exist in some aspects of free speech. *Id.,* at 574–76, 575, n. 14, 92 S.Ct. at 2708, 2708 n. 14 (stating that "[w]hen a State would directly or indirectly impinge upon interests in free speech or free press, the [Supreme] Court has on occasion held that opportunity for a fair adversary hearing must precede the action, whether or not the speech or press interest is clearly protected under substantive First Amendment standards"); *Lawshe,* 16 F.3d at 1479, quoting *Gitlow v. New York,* 268 U.S. 652, 666, 45 S.Ct. 625, 630, 69 L.Ed. 1138 (1925) (assuming that "freedom of speech ... [is] among the fundamental personal rights and liberties protected by the due process clause of the Fourteenth Amendment from impairment by the States").[3]

---

3. A liberty interest may be created by a state regulation containing "explicitly mandatory language, *i.e.,* specific directives to the decisionmaker." *Thompson,* 490 U.S. at 463, 109 S.Ct. at

On March 25, 1993, this Court granted a Motion to Dismiss Rubin's liberty claims for failure to state a claim and allowed Rubin to file the Amended Complaint currently before it. (Order, 3/25/93, pp. 12, 14.) Rubin now alleges procedural due process violations of his liberty interests in First Amendment free speech, First Amendment academic freedom, and academic freedom as created by state law.[4] Speech in a classroom context and academic freedom are aspects of free speech in which a liberty interest can exist. These liberty interests require a fair adversary hearing.

### 2. Was there proper process?

The next inquiry is whether Rubin received proper process. A determination whether a defendant complied with federal procedural due process rests on the process due under the federal Constitution because "[f]ederal judges do not enforce state-created procedures in the name of the Constitution." (Internal quotation marks omitted.) *Kraushaar*, 45 F.3d at 1049; *accord White v. Olig*, 56 F.3d 817, 821 (7th Cir.1995).

Rubin does not contest the validity of the procedures established to handle incidents of sexual harassment but argues that Defendants did not follow them with respect to the grievances filed against him. He argues that he was entitled to process as set forth in *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). Defendants argue that Rubin is not entitled to the process due under *Loudermill* but that, if he were entitled to such process, he received it. *Compare Hill v. Trustees of Ind. Univ.*, 537 F.2d 248, 250–52 (7th Cir. 1976) (stating that a student received all the process he was due under the university's procedures, even though the university failed to comply in full with its own procedures) *and Flath v. Garrison Pub. Sch. Dist. No. 51*, 82 F.3d 244, 246 (8th Cir.1996).

The Court in *Loudermill* specified that its inquiry was what procedures must be followed before termination of a tenured employee and that the hearing required depends on "the importance of the interests involved and the nature of the subsequent proceedings." (Internal quotation marks omitted.) *Loudermill*, 470 U.S. at 545, 105 S.Ct. at 1495. As Rubin was not terminated, whatever process, whatever hearing, is due to him would arguably be less than that afforded under *Loudermill*.

Under *Loudermill*, before termination, Rubin would be entitled to "oral or written notice of the charges against him, an explanation of the employer's evidence, and an

---

1910; *accord Kraushaar*, 45 F.3d at 1048–49. Not all state rules and regulations, even those containing substantive standards or criteria for decisionmaking, create "legitimate claims of entitlement triggering the protections of the procedural due process clause." (Internal quotation marks omitted.) *Kraushaar*, 45 F.3d at 1048. Some statutes and regulations merely direct how "state personnel exercise their discretion to perform certain activities." *Id.*, at 1048–49.

As to the present case, Article I, § 2 of the Illinois Constitution guarantees due process. Ill. Const. art. I, § 2. Article I, § 4 states that:
All persons may speak, write and publish freely, being responsible for the abuse of that liberty.
Ill. Const. art. I, § 4. The Illinois statutes state that the University encourages full freedom of teaching within the law. (Complaint, ¶ 11.) The *Academic Staff Handbook* provides for free discussion in the classroom within constraints. *Id.*, ¶ 12.
None of these provisions contains even a single substantive standard or criterion for decisionmaking, and they in no way direct a decisionmaker to reach a particular outcome under cer-

tain circumstances. *See Robinson*, 902 F.Supp. at 842. Thus, the Court cannot use this analysis to find that any of Plaintiff's alleged liberty interests are proper.

4. As to the liberty interest in academic freedom created by state law, Article I, § 2 of the Illinois Constitution guarantees due process and does so to the same extent as the federal Constitution. Ill. Const. art. I, § 2, Constitutional Commentary of the Smith–Hurd Compiled Statutes Annotated.

Article I, § 4, the free speech provision, may afford "added protections in the field of libel and perhaps in other fields," although the term "other fields" has not been defined. (Internal quotation marks omitted.) *People v. DiGuida*, 152 Ill.2d 104, 604 N.E.2d 336, 343, 178 Ill.Dec. 80, 87 (1992). This Court can find no Illinois case law indicating that academic freedom is a field of free speech in which § 4 provides greater protection than the federal Constitution. In fact, both parties seem to argue that it does not. (Memo. in Support, pp. 10–11; Response to Reply, pp. 2–3.) Plaintiff has a liberty interest in academic freedom created by state law to the extent that he has one under the federal Constitution.

opportunity to present his side of the story." *Id.* He did receive a copy of a grievance. (Rubin Dep., p. 51.) The grievances and his concession that he had the opportunity to "give brief reasons for having made the statements" indicate that he was informed as to Defendants' evidence regarding what was said in the classroom. (Memo. in Opp., p. 4.) Defendants cite to three depositions to support their contention that Rubin "was given an opportunity to explain why he made the statements and he did explain his teaching method." (Memo. in Support, p. 3, citing Manolakes Dep., pp. 132–34, 139–41; Ken Anderson Dep., p. 57; Veasie Dep., pp. 78–80.) The Court finds that Rubin received more than adequate predeprivation process before Manolakes' decision.

As to postdeprivation process due, Defendants argue that Rubin agreed to his removal from the class in a letter to Vice Chancellor Berdahl and signed the March 12, 1990 agreement which encompasses all impact on Rubin. (Memo. in Support, p. 7.) Defendants further argue that Rubin was not terminated, suspended, fined, or docked pay. *Id.*

Rubin counters that he was not given the opportunity to argue why academic freedom and free speech should be considered, state why the context of his statements must be preserved, or test the motives of the grievants. (Memo. in Opp., p. 4.) He maintains that his agreeing to his reassignment is meaningless because he had no option, like "an arrestee saying 'Yes, officer' even if the arrest is wrongful—for to do otherwise is [sic] invite trouble!" *Id.* Rubin stated that he thought the incident would be concluded before the end of the semester, even in one day. (*Id.*, at 4; Rubin Dep., pp. 60–61.) There were between 11 and 14 classes, or about 2.5 weeks of class, left in the semester. (Rubin Dep., p. 62.)

As stated above, Rubin's "opportunity to give brief reasons" for his statements provided a sufficient opportunity for Defendants to remove him from teaching Social Studies Methods. (Memo. in Opp., p. 4.) Further, in the context of a sexual harassment case, a hearing has been found to satisfy due process, although it was not all encompassing.

*Green v. Board of School Comm'rs,* 716 F.2d 1191, 1193 (7th Cir.1983) (involving a school bus driver).

Rubin counters that when he signed the March 12, 1990 agreement, he did not know that Manolakes had notified the students that he had sexually harassed them. (Memo. in Opp., p. 4.) Rubin argues that he "wrote the letter asking for official word on the grievance results." *Id.,* p. 5. He also argues that the "rumor mill" indicated that Manolakes had made a finding of guilty and that "[t]his is far different from knowing of the guilty finding." *Id.; see* Rubin Dep., p. 83.

Rubin's letters of March 7, 1990 and March 8, 1990 state, respectively, that he had learned that day that "the students' grievance was granted" and that "I would like to have copies of the letter granting the student grievance complaint." (Rubin Dep. Exhs. 7, 8.) On March 27, 1990, he again requested a copy of the letter. (Affidavit of Manolakes, filed 11/3/92, Exh. 6.) A March 30, 1990 letter from Rubin's counsel to Manolakes directs that Rubin's "previous letters to you are to be taken as an appeal of that finding." (Rubin Dep., Exh. 11.)

The Court finds that Rubin's letters may be taken as proof of his understanding that the grievances had been granted before March 12, 1990. On March 12, 1990, he knew that the students' grievances had been granted and that they had received a letter to this effect, but he possessed no copy of the letter. The Court is not moved by Rubin's contention that he knew of rumors on or about February 27, 1990 that he had been found guilty of sexual harassment but did not *actually* know of a guilty finding. Rubin has submitted nothing other than his argument to show that this is a disputed issue of material fact, and he may not rely on mere allegation in opposing a motion for summary judgment. The only facts in the record directly contradict his argument.

Rubin's knowledge of the guilty finding when he signed the March 12, 1990 agreement satisfies any concerns about the postdeprivation process. A plaintiff cannot sign a document setting forth the elements needed to close an administrative process, such as

Rubin did by signing the March 12, 1990 agreement, and then complain that he did not receive proper process. His lawyer may not direct that his client's communications with a university official are "to be taken as an appeal" of that official's decision and then deny knowledge of that decision.

The *Mathews* factors also balance to favor Defendants. *See Mathews*, 424 U.S. at 334–36, 96 S.Ct. at 903. Although Rubin's private interest in not being found guilty of sexual harassment is a valid interest, there was little risk that Manolakes' decision was not valid in that Rubin signed the March 12, 1990 agreement knowing of the decision. Defendants' need to secure an atmosphere free of sexual harassment for their students, and the absence of a benefit to be derived from further hearings after Rubin's signing of the March 12, 1990 document further direct a finding that sufficient due process was accorded to Rubin under the circumstances of this case.

Accordingly, since Rubin received all the process due to him under federal law, Defendants' Motion for Summary Judgment is GRANTED as to Counts I, II, and III.

### B. State Procedural Due Process Claims

It appears that the premise behind Rubin's state claims for violations of procedural due process is that the state may not deprive him of his liberty interests in state-created rights without affording him due process. The liberty interests alleged are in free speech, academic freedom, and academic freedom created by state law.

Neither party argues that the Court's analysis as to the viability of these liberty interests should differ from analysis as to the federal claims. To the contrary, Rubin adopted the arguments as to the federal counts for the state counts. (Memo. in Opp., p. 9.) Defendants argue that under Illinois law the liberty interests are not valid and that absent termination or suspension there is no right to a due process hearing. (Memo. in Supp., p. 12.) Defendants also argue that

constitutional and due process law in Illinois has not developed distinct from federal law. (*Id.*, pp. 10–11.) Further, this Court has found no authority to lead it to a different conclusion and finds a valid liberty interest in free speech and academic freedom as they are created by state law.

As to the process required under state law, Defendants argue that Illinois law neither offers nor demands greater procedural protection for Rubin's alleged rights than exist federal law. (Memo. in Supp., p. 12.) Rubin makes no distinction between addressing his federal versus his state arguments. (Memo. in Opp., pp. 1–9.) The Court finds that no additional process is required from the federal requirements and, as set forth above, that the federal requirements were met. Accordingly, Defendants' Motion for Summary Judgment is GRANTED as to Counts X, XI,[5] XII, XVIII, XIX, and XX.

### IV. Non Due Process Counts

The remaining six counts, two federal and four state, with two of the state counts seeking declaratory and injunctive relief and the other two seeking damages, allege violations of Rubin's First Amendment and academic freedom rights. As stated above, academic freedom is a "special concern" of the First Amendment and not an independent fundamental right. *University of Penn.*, 493 U.S. at 194–99, 110 S.Ct. at 585–87; *Bishop*, 926 F.2d at 1075. Further, the Court has found the protections available for potential violations of this right to be the same under federal and state law. As such, the Court's analysis of these six counts is consolidated.

During the telephonic status conference on March 21, 1996, the parties clarified their positions on these claims. At that time, both parties stated that the issue before the Court is whether Manolakes' decision that the grievances were valid was itself constitutionally valid. (Tr. of March 21, 1996, pp. 5–6.)

During the telephonic status conference, Defendants argued that the decision was con-

5. Rubin has made duplicative allegations. Counts XII and XX (academic freedom) and Counts X and XVIII (academic freedom created by state law) all are state claims of academic freedom. Thus, it is implicit that Counts XII and XX are based on state law. In the alternative, it need not be explicit that Counts X and XVIII are based on state law.

stitutionally invalid only if it were arbitrary and capricious and that it was not arbitrary and capricious. *Id.*, at 6; Reply Memo., p. 1. In their Reply Memorandum, Defendants argue that the balancing test in *Bishop*, 926 F.2d at 1074–75, applies and provide an analysis of the factors outlined in that decision. (Reply Memo., pp. 2–5.)

Rubin agreed during the telephonic status conference that the arbitrary and capricious standard is to be applied, but he asserted that the facts were such that the Court must conclude that the decision was arbitrary and capricious. (Tr. of March 21, 1996, p. 7.) In his Response to Reply Memorandum, however, Rubin argues that resolution of these issues goes beyond Manolakes' having made an arbitrary, capricious, and unsupported decision. (Response to Reply, p. 1.) Without explaining why, Rubin argues that the three-part *Mt. Healthy* test is dispositive of this case. *Id.*, at 3, citing *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 286–87, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). Rubin also mentions a litany of arguments: his classroom speech rights are at issue, his speech must not be chilled, the University retaliated against him, and the University officially encourages free classroom speech but stifles it to achieve political correctness. (Response to Reply, pp. 2, 5, 9, 10.)

Analysis of these claims does not fit squarely within the framework proposed by either side. Case law reflecting the factual situation of this case is sparse.

As set forth above, academic freedom is not an independent First Amendment right, but, as a type of speech and a special concern of the First Amendment, it is protected. *University of Pa.*, 493 U.S. at 194–99, 110 S.Ct. at 585–87; *Bishop*, 926 F.2d at 1075; *Piarowski*, 759 F.2d at 629. The *University of Illinois Statutes* and the University's *Academic Staff Handbook* both entitle Rubin to academic freedom. (Complaint, ¶¶ 11, 12.) They do so, however, "within the law" and within the constraints of teaching in a manner consistent with faculty approval. *Id.* As such, they do not provide a faculty member with unbridled academic freedom.

The grievances set forth the comments which Rubin made during class—and, in Braun's grievance, comments made to her outside of class—that, in the grievants' opinion, constituted sexual harassment. (Complaint, Exh. C.) In the Report on Interviews Conducted with Students, the University interviewers asked 5 students (the only 5 of the 33 students in the all-female class who agreed to speak with them) about selected comments mentioned in the grievances. *Id.*, Exh. G. The students confirmed that Rubin had made certain comments and stated their belief that the comments were appropriate in the context in which they were made. *Id.* Rubin verified that he had made sexual comments. (Rubin Dep., p. 33; Manolakes Dep., pp. 132–34; Ken Anderson Dep., pp. 56–57; Veasie Dep., pp. 78–80.) As such, there is no real factual dispute between the parties as to what was said.

Some degree of dispute exists as to the context of Rubin's comments concerning the legitimate role these statements had in teaching about elementary education; however, none rises to the level of a dispute of material fact which would prevent entry of summary judgment as to Rubin's claims. Rubin was teaching Elementary Education 345, a methodology course for prospective teachers to learn how to teach social studies. The class, in general, was a prerequisite both for clearance to student teach and for receipt of a teaching certificate. (Rubin Dep., pp. 26–27.)

The interviewers confirmed that Rubin made comments and inquiries about being celibate, preferring a husband who is professionally successful or a great lover, believing in abortion, teaching about lovemaking, dispensing birth control, and cooking breakfast in the nude (upon request from a husband). (Complaint, Exh. G.) They verified that Rubin made personal references to his being taught how to dance by a student, his divorce settlement, his ex-wife and "three worthless daughters," his being an aging bachelor, women feeling better when wearing Parisian underwear, and his not being (sexually) able to take yes for an answer. *Id.* They established that Rubin told at least one dirty joke. *Id.* Braun's tape recordings of the class

confirmed that Rubin had expressed unconditional love for a student and had addressed students as "babe" or "baby." *Id.*

The interviewed students confirmed that Rubin indeed had asked students to inform him when his conduct and comments were inappropriate because he had received previous complaints. *Id.* At his deposition, Rubin testified that during the previous semester, a student had complained about inappropriate touching and that students had complained about his inappropriate statements. (Rubin Dep., pp. 29–31.) Rubin testified that he knew some of his comments were sexist but stated that "it was done in irony." *Id.,* at 43.

Further, the Court is mindful that the references offered in the previous paragraph are to comments verified by the interviewers but that the grievants alleged additional comments. For example, outside the classroom, Rubin inquired as to whether Braun was married and had children, her age, and what her husband's occupation was. *Id.* Regarding additional allegations of what transpired in the classroom, the grievances state that Rubin said that:

> [H]e should have had his wife get a pelvic exam before he married her "to see if she could drop babies" [and that] his first child happened in an irrational moment "on one long cold winter night."

*Id.* They also state that after Rubin remarked that a female student was smart, " 'for a woman,' " he looked at one grievant and said, " 'You're glaring at me. You're upset.' " *Id.* The grievances relate Rubin's asking a "visibly uncomfortable" student whether she would marry a paraplegic with " 'no vital functions from the waist down' " and then polling the class to determine each student's opinion. *Id.* The grievances offer that Rubin asked another student if she could differentiate between love for her boyfriend and love for her mother; advocated that if he were king, women teachers would spend 15 minutes in a canoe on a moonlit night with a drunken sailor; pondered whether Braun was " 'thinking about whether it was a good idea to marry a lawyer, or whether she should have another baby' "; and inquired how Indian women can be

" 'stupid' " enough to follow the customs that he had just described. *Id.* The grievances relate that Rubin's joke concluded that teachers make good prostitutes because they encourage their students/customers " 'to do it again and again until they get it right.' " *Id.*

Rubin argues that the comments are "pedagogically correct examples ... of modern day situations" with a sexual content and that he was "teaching of modern values, morals, and social conditions." (Response to Reply, p. 3.) He argues that a class' content and a professor's performance in class are, seemingly, of equal importance and that he treats his students as "serious, open-minded contemplative seekers after wisdom." *Id.,* at 6–7. In this context, Rubin maintains, his comments are not just appropriate, they are desirable. *Id.* Apparently, Rubin believes his teaching style enables him to keep the interest of his students, but he does not explain how this teaching style justifies some of his sexual comments. He does not define the relationship between "teaching future teachers how to think and to consider matters relevant to their courses," *Id.,* at 5, and the sexual comments made during his Elementary Education 345 class. Rubin has not explained the context of his comments beyond stating that they are pedagogically correct.

To apply a legal framework to this matter, under *Bishop,* a court considers three items in balancing the needs and objectives of the parties: the university's position as a public employer, the strong predilection for academic freedom, and the context of the university classroom. *Bishop,* 926 F.2d at 1074–75. Under *Bishop,* a university may question and redirect a professor's educational judgment and may prevent a professor from presenting certain views during instructional time. *Id.,* at 1076–77.

In the present case, the University is a public employer. While academic freedom is protected, it is not an independent First Amendment right, and a court:

> [C]annot supplant our discretion for that of the University. Federal judges should not be ersatz deans or educators. In this regard [a court is to] trust that the Universi-

ty will serve its own interests as well as those of its professors in pursuit of academic freedom. University officials are undoubtedly aware that quality faculty members will be hard to attract and retain if they are to be shackled in much of what they do.

*Id.,* at 1075. As to context, most of the comments discussed in the grievances were made in the University's classroom in a class to prepare students to teach *elementary* school social studies.

The *Academic Staff Handbook* states that decisions to sanction those accused of offending the sexual harassment policy are made on a case-by-case basis. (Complaint, Exh. A.) Under the *Bishop* factors, nothing indicates that Defendants' conclusion that Rubin violated the sexual harassment regulation is arbitrary, capricious, or unreasonable. Under a subjective standard, Rubin made comments which are legitimately offensive. In fact, he conceded that some students have found his classroom content offensive. (Rubin Dep., pp. 30, 38, 42–44.) Under an objective standard, 5 students who agreed to be interviewed felt that they spoke for the class and uniformly stated that Rubin's comments were not offensive. While the opinions of these 5 students may be relevant and, if applying a reasonable person standard, may lead to a conclusion that the class was not (or should not have been) offended, they are not determinative. A determination of the validity of the Defendants' decision cannot rest entirely on the opinions and representations of 5 students in the class who stepped forward in support of Rubin as opposed to the two grievants.

Defendants' decision also does not appear unreasonable based on the information in the record as to the purpose and focus of Elementary Education 345. The Court is unable to understand how a reasonable jury could conclude that many of Rubin's classroom comments could be appropriate for teaching students how to teach elementary school social studies classes, to say nothing of Rubin's comments to Braun outside the classroom. Rubin's classroom comments which have a sexual focus do not appear connected to the course content and legitimate objective of teaching students how to teach elementary school social studies. The degree of departure from the expected course content to Rubin's comments appears extensive. Their relevance is quite attenuated.

The Court recognizes that, in any classroom situation, professors and students alike will make unrelated or seemingly unrelated comments. The dilemma exists in characterizing such comments. How is the Court to assess with any certainty whether the comments are neutral, politically incorrect but protected, or offensive enough to give rise to or require a University response? What is certain is that a university's response to sexual harassment grievances must be reasonable.

The Court does not aim to suggest guidelines for the relationship between a professor's classroom conduct and a university's response. The Court has no intention to direct how a university should conduct its case-by-case assessment of the circumstances giving rise to sexual harassment grievances. The Court merely finds that, in this case, it is clear that the response was reasonable

Defendants' actions were minimal and reasonable in stating that they could consider this matter during Rubin's salary review, monitor Rubin's teaching, have Rubin present plans to incorporate many "different domains of human experience" into his teaching, and have him re-examine "his motivations and purposes for the examples he chooses." (Complaint, Exh. I.) In fact, Defendants did not enforce these remedial measures with any vigorousness. Defendants' actions were not an overreaction; they were a reasonable response to a sensitive situation. Any restriction on Rubin's speech and Defendants' correlative finding of sexual harassment were reasonable and resulted in no First Amendment violation.

As a framework for further analysis, in *Mt. Healthy* the Supreme Court set forth a three-prong test for evaluating First Amendment claims in a public employment discharge case. *Mt. Healthy,* 429 U.S. at 280–82, 97 S.Ct. at 573. The first prong of the *Mt. Healthy* test requires a plaintiff to show that his speech was constitutionally protected. *Id.,* at 282–84, 286–87, 97 S.Ct. at 574,

576. The second prong inquires whether the protected conduct was a substantial or motivating factor in the adverse employment action, and the third prong inquires whether the defendants can show that their decision would have been the same absent the protected conduct. *Id.* at 286–87, 97 S.Ct. at 576.[6]

As to the first prong, speech is constitutionally protected if "it touches upon a matter of public concern" and the employee's interest in self-expression "outweighs any injury the speech could cause" to the public employer's interest. *Wright v. Illinois Dep't. of Children & Family Servs.*, 40 F.3d 1492, 1499–1500 (7th Cir.1994); *accord Connick v. Myers*, 461 U.S. 138, 146–54, 103 S.Ct. 1684, 1690–93, 75 L.Ed.2d 708 (1983); *Waters v. Churchill*, 511 U.S. 661, ——, 114 S.Ct. 1878, 1884, 128 L.Ed.2d 686 (1994). The inquiry as to whether speech touches upon a matter of public concern presents a matter of law and calls for ascertaining the content, form, and context of the employee's speech, as revealed by the whole record. *Connick*, 461 U.S. at 148 n. 7, 103 S.Ct. at 1690 n. 7; *Yoggerst v. Hedges*, 739 F.2d 293, 295 (7th Cir.1984). Content is more important than form and context, but the speaker's motivation and the forum are important because otherwise any dispute with a public employer may be construed as a matter of public concern. *Wright*, 40 F.3d at 1501. The speech considered is the speech that led to the adverse decision. *Waters*, 511 U.S. at ——, 114 S.Ct. at 1891; *Connick*, 461 U.S. at 148–50, 103 S.Ct. at 1691; *Caruso v. De Luca*, 81 F.3d 666, 670 (7th Cir.1996). The process of making this determination is an "inexact science." *Wright*, 40 F.3d at 1503.

Public employees do not have First Amendment rights unless the topic of their speech is a matter of public concern and they are speaking as interested citizens. *Connick*, 461 U.S. at 146–48, 103 S.Ct. at 1690. The University has the right to control classroom content. *Clark v. Holmes*, 474 F.2d 928, 931 (7th Cir.1972), *cert. denied*, 411 U.S. 972, 93 S.Ct. 2148, 36 L.Ed.2d 695 (1973). Course content is not a matter of public concern. *Id.* This results from the fact that disputes about course content involve the public employee as a teacher and not as an interested citizen. *Id.* Speech is not a matter of public concern if it is motivated by private interests. *Yoggerst*, 739 F.2d at 296.

Although Braun's grievance made Defendants aware of certain comments Rubin made outside the classroom, Rubin focuses his First Amendment claims on the comments he made during his teaching of Elementary Education 345. As stated above, the Court does not imagine how a jury could find that Rubin's comments were related to the content of a course designed to teach college students how to teach elementary school children about social studies. Rubin spoke about his sexual ability/inability, dancing lessons from a student, Parisian underwear, his divorce, and his "three worthless daughters" out of personal interest and not as an interested citizen. He did not call students "babe" and "baby" or declare his unconditional love for a student in order to address a matter of public concern. The same logic follows for Rubin's inquiries into his students' priorities in selecting husbands or their personal opinions on the distribution of birth control in schools.

In concluding that Rubin's comments do not constitute a matter of public concern, the Court is mindful of the Seventh Circuit's

---

6. Earlier this year, the Seventh Circuit rephrased the *Mt. Healthy* test as to whether the speech would be protected if not uttered by a public employee; whether, according to the United States Supreme Court in *Connick*, the speech is worthy of judicial intervention; and whether the public employer "had a convincing reason to forbid the speech." *Dishnow v. School Dist. of Rib Lake*, 77 F.3d 194, 197 (7th Cir.1996). Other cases have discussed the intersection of the *Mt. Healthy* and *Connick* lines of cases. *See Ziccarelli v. Leake*, 767 F.Supp. 1450, 1453 (N.D.Ill.1991) (devising a test using *Connick* to determine

"whether the expression touches upon a matter of public concern" and to balance the employee and employer interests and using *Mt. Healthy* to require the plaintiff to show that the speech motivated the employment decision and the employer to show it would have made the decision absent the protected activity); *but see Lindahl v. Bartolomei*, 618 F.Supp. 981, 988 n. 3 (N.D.Ind. 1985) (stating that *Connick* applies when the speech is disruptive and that *Mt. Healthy* applies in a mixed motive case when the issue is whether speech caused the dismissal).

reminder that matters of public concern need not touch upon matters of "transcendent importance, such as the origins of the universe or the merits of constitutional monarchy" but just need to be "matters in which the public might be interested, as distinct from wholly personal grievances" which are "too remote from the First Amendment's central concerns to justify judicial interference with the employment relation" or which may be unprotected chit-chat. *Dishnow v. School Dist. of Rib Lake,* 77 F.3d 194, 197 (7th Cir.1996). Rubin's comments are exceedingly remote from the First Amendment's concern with protecting "socially valuable" expression. *Eberhardt v. O'Malley,* 17 F.3d 1023, 1027 (7th Cir.1994).

As Rubin's comments are not a matter of public concern, the Court need not undertake to balance the parties' competing interests to determine whether Rubin's speech is protected. Further, the Court need not reach the second and third prongs of the *Mt. Healthy* test. *See Mt. Healthy,* 429 U.S. at 274, 97 S.Ct. at 568. Under *Mt. Healthy* as well, then, Rubin's First Amendment rights were not violated.

The Court's conclusion here is appropriate because often a "federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick,* 461 U.S. at 147, 103 S.Ct. at 1690. The propriety of denying Rubin's claims is bolstered by what may be construed as retaliation by Rubin against the grievants. Rubin informed the class that a relative of a complaining student had called him (Braun's husband had sat outside the classroom) and that one complaining student had been taping the class (Braun's tape recorder was openly displayed). (Complaint, Exh. C.) The students in the class were able to identify Braun, if not both grievants. *Id.* As a result of Rubin's announcement and assignment of an additional project, other students in the class became upset, both in general and with the grievants. *Id.* Rubin's management of the situation made the classroom environment increasingly intolerable for the grievants. *Id.*

Accordingly, Defendants' Motion for Summary Judgment is GRANTED as to Counts VII, VIII, XVI, XVII, XXIV, and XXV.

### Conclusion

For the reasons set forth above, Defendants' Motion for Summary Judgment [# 19] is GRANTED. This case is terminated.

### EXHIBIT C

### FORMAL GRIEVANCE—CHARGE OF SEXUAL HARASSMENT

*Identification of Complainant*

Terre Braun
6 Eton Court
Champaign, Illinois 61820
359–8578
graduate student in Education

*Identification of Respondent*

Louis Rubin, professor,
Department of Education

*Origin of Charge*

This grievance is brought pursuant to the University of Illinois Urbana–Champaign campus Administrative Procedures for Complaints and Grievances of Discrimination and of Sexual Harassment and the University of Illinois at Urbana–Champaign, Code on Campus Affairs and Handbook of Policies and Regulations Applying to All Students (August 1989) Rule 2, page 11; Rule 25, page 20.

*Nature of Alternative Causes*

Complainant has a cause of action under the Illinois Human Rights Act (Ill.Rev.Stat. c. 68, sec. 1–101 et seq., Ill.Rev.Stat. c. 68, sec. 2–101(E)), other state remedies and remedies available pursuant to Title VII (see also 29 C.F.R. sec. 1604.11) in the Federal Court for the Central District of Illinois. Note that many of the causes available contain fee-shifting provisions. This grievance is an attempt to resolve this cause without resort to alternative remedies. All parties should note that jurisdiction is concurrent. Remedies outside the University have a 180 day limitations period and that if relief is not obtained

within the University within a reasonable period of time short of the limitations period, a cause or causes of action outside the University will be initiated.

### Short Statement of Complaint

Respondent professor has repeatedly made inappropriate sexual remarks in class, has created a sexually threatening classroom environment, has committed the offense of sexual harassment and has retaliated against Complainant for objecting to the sexual content of his lectures.

### Facts

Complainant is a female graduate student in good standing in elementary education in her last semester before graduation. She has a cumulative grade point average of approximately 4.75/5.0. Complainant is enrolled in Elementary Education 345, spring semester 1990. Elementary Education 345 is social studies methods. The class enrollment is composed entirely of female students. Dr. Louis Rubin, Respondent, is male and teaches said class which meets five days per week from 10 a.m. until 12 p.m. Complainant has received no graded evaluations to date in said class, and this is not a grade-related complaint.

Complainant alleges Dr. Rubin has created a sexually demeaning and sexually threatening environment in this class. The following specific allegations are relevant. No specific allegation is related to establish a single incident which rises to the level of sexual harassment, but rather, that the frequency of Respondent's inappropriate behaviors is, taken together, egregious:

1. On or about January 11, 1990 Respondent told the instant class, "I found a system that works with women. I am celibate." Respondent then approached a student, Kathy Anderson, and asked in a threatening tone, "You don't think that's funny?" Ms. Anderson replied that she did not think it was funny.

2. On January 11, 1990 Respondent told class there had been previous complaints about his sexist behavior in class and asked the class to stop him if he made sexist remarks during the semester. He also informed class that in the past students had told him they felt it was inappropriate of him to have touched them on the head or back. Respondent informed class he wished to be reminded if he slipped and touched someone or if he made a sexist remark.

3. On January 12, 1990 Respondent approached Complainant outside class and asked a series of questions related to her marital status, her age, her husband's occupation, whether or not she had children, and which sought to determine whether or not she was happily married.

4. On January 12, 1990 Respondent told class he made three irrational decisions in his life, "getting married, having a baby and buying a house". He also told the class he should have had his wife get a pelvic exam before he married her "to see if she could drop babies". He told the class that his first child happened in an irrational moment "on one long cold winter night". Nearly the entirety of the January 12, 1990 lecture related to a recitation of Respondent's marital relations and his "three irrational decisions". Respondent frequently punctuated his lecture with the expressions, "hot damn" and "bullshit". On another occasion during this lecture Respondent asked class rhetorically if their mothers had advised them to wear clean underwear in case they were in an accident. Respondent described Ben Franklin as a "rake", gave examples of Franklin's promiscuity (specifically recalling Franklin's extramarital affairs), and inquired of students in his class whether or not they would teach these facts to their elementary classes. Respondent said to a student, "You're smart—for a woman. Was that sexist? I have to tease to keep you awake. Would it have been sexist to say, 'that's smart for a man'?" Respondent then looked at student Kathy Anderson and said, "You're glaring at me. You're upset." Ms. Anderson did not respond. Later during the same January 12, 1990 lecture Respondent used the following example: You are engaged to be married to a handsome young man. Two weeks before the wedding he is in an accident and becomes paraplegic. Respondent asked a student

whether she would still marry him. The student was visibly uncomfortable with the question, but eventually responded that she would. The Respondent thereafter ridiculed the student by stating, "Oh, come on now, this guy has no vital functions from the waist down!" Respondent polled the class to determine who would marry the paraplegic and who would not.

5. On January 16, 1990 a student corrected Respondent's pronunciation of her name during roll. Respondent remarked, "Makes me develop sympathy for your future husband." Respondent polled the class as follows: "How many of you are married?" "How many of you are engaged?" "How many of you are taken?" While taking roll he remarked to another student, "Great sweater!" Respondent then addressed the entire class, "Now was that sexist?" Respondent thereafter remarked to class, "Now if Mary Jo ever gets around to wearing a decent blouse ..." (Mary Jo Norkus is a student in class).

Respondent next told a story about "his three worthless daughters". Respondent followed with a story about the history of education. Contained in the story was the assertion that men taught their sons to hunt and mothers taught their daughters to cook. Respondent later told students, "If you teach about AIDS in the classroom you will have to get into heterosexuality, homosexuality, anal sex and oral sex." He asked the students if they would be comfortable teaching these subjects. He lectured the class about various dating experiences he had had. Next, Respondent asked a student if she knew "the difference between love for your mom and love for a boyfriend?" Respondent polled the class, posing the following questions: "Are all women interested in their looks?" "Are women more interested than men in their looks?" "Are women everywhere interested in looking good?" He asked specific students the following questions: "Would you rather have a wealthy husband, or a handsome husband?" "Would you rather have a husband that's funny, or one that's caring and understanding?" "Would you rather have a husband that's successful professionally, or one that's a great lover?" One stu-

dent responded that she would rather have a husband who was professionally successful because "you could always work on the other." Respondent replied, "My compliments". Respondent referred, in no particular context, to Xanthippe, Socrates wife, saying: "She was a shrew, a mean bitchin' kind of woman—hell to live with." Out of any context, Respondent said, "I am the dude. I am the oracle. She is the sponge."

At another time during this lecture Respondent said, you probably look at me and wonder why I dress the way I do. Respondent turned so that his back faced the class. He put his hands in his back pockets, shook his rear end and announced, "I can't help it. I have a medical disease. It's called no ass-at-all". Respondent described a recent dating experience, dancing and drinking with beautiful women who "dragged him to a disco". Respondent asserted that he cannot dance, but desired to learn. Respondent told the class that one of his students had once offered to teach him to dance. The student and Respondent had met at Respondent's office after class to decide where the dancing instruction would take place. Respondent asked if the student would be uncomfortable teaching him at his home. The student replied that she would not be uncomfortable. Respondent said, "On our first date she just had me keep bouncing up and down—up and down". Respondent described his musical taste as "Mozart". The student in the instant story advised him to get different music. He told the class he couldn't remember name of the song she suggested. He asked the class to help him remember. His cue to the class was that it was "a dirty song" by Michael Jackson—the class suggested "Billie Jean"—Respondent affirmed the class had guessed correctly.

Later in the same lecture, Respondent asked members of class: suppose for the last 60 years of your life you could have the body or the mind of a thirty year old woman, but not both—which would you choose? Respondent insisted that students answer.

Respondent also required students to respond to the following poll: "How many of you believe in abortion?" "How many of you believe in corporal punishment?" "How

many of you believe in capital punishment?" "How many of you believe that sexism is dangerous?" "How many of you believe that sexism is inevitable?" "How many of you believe that men have only one thing on their minds?" "How many of you believe that men have two things on their minds—they like to eat as well?"

Respondent told the class he was going to tell them "an adult joke, a very famous joke, a very dirty joke, a very sexist joke". Respondent told the class, "The problem in schools is uppity, greedy women". Respondent said, "If I were king, all women teachers would have to spend fifteen minutes on a moonlit night, in a canoe, on a lake with a drunken sailor"

Respondent told the promised "dirty joke". The joke was about teachers as prostitutes—the punchline was that teachers make good prostitutes because they tell their customers to do it again and again until they get it right.

6. On January 17, 1990 the lecture began with a series of examples concerning the place of women in society and the advantages men have in dating situations. Respondent offered that he often sends flowers to his ex-wife and "three worthless daughters". Respondent said, "If my ex-wife didn't have me to send her roses, she wouldn't get any." Respondent explained at length his divorce settlement. He told the class his wife wanted two-thirds because "she was old and used up." In explaining networking among women, Respondent told the class: For example, Terre's (Complainant) husband is a lawyer. You want some legal advice, so you call Terre and "Terre gets free legal advice over pillow talk with her husband". Respondent commented on one student's answer as follows: "That's not bad at all—for a woman." During another student's answer to a question Respondent interrupted. The student offered that Respondent might prefer another named student answer the question because her answer might be better. Respondent offered that the other student was not smarter "she's just been married longer and she's more experienced". Later in the same lecture, Respondent said, "Maybe Terre (Com-

plainant) is thinking about whether it was a good idea to marry a lawyer, or whether she should have another baby."

During the same lecture, Respondent turned to a student in class and asked if she was married. She answered. Respondent asked the class, "If I went to Chicago for dinner would you guess I'd spend a lot of money or not?" "Would you guess that I'd prefer to dine with a woman or a man?" "Suppose a husband and wife came to your adult education class and requested you teach a class on lovemaking because the cause of divorce is incompatibility and lovemaking is part of compatibility—so, would you teach a class on lovemaking? Foreplay? Afterplay?"

7. Respondent began the January 18, 1990 lecture with a discussion of his "one experiment" with "pot" at the suggestion of his "three worthless daughters". Respondent said teen pregnancy was extensive and urged the importance of sex education. He polled the class as to how many students would favor schools dispensing birth control devices to students in high school. Respondent told the class the cost of raising a child for first the first eighteen years of its life is $350,000. Respondent suggested the cost "should be posted on each married couple's bedroom door." Respondent told class: "Rubin's 9th law: Make certain at least once in your life you treat yourself to fine Parisian underwear. French underwear, I'm told, makes women feel better."

Respondent also told class:

"I need maid service because I'm an aging, half-assed bachelor."

"I need to have an electric blanket to keep me warm because my bed's so big I get lost in it."

"You're not here to learn social studies; you're here to get a piece of paper. If you want to learn social studies you should go observe a social studies teacher instead of listening to my drivel. Then you can convert that piece of paper into a husband or a new house"

"School is a place to dump the kids so Terre (Complainant) can get her hair done".

Later Respondent told a story about he and Abe Maslow, for which the punchline was, "At my age I can't take 'yes' for an answer". Respondent turned to Phyllis (a student in class) and inquired, "Was that funny?" Phyllis replied, "Yes." Respondent asked another student, "Kathy was that funny?" Kathy answered, "No." Respondent pressed, "Was that sexist?" Kathy replied, "It has nothing to do with social studies."

Still later Respondent gave examples of (Asian) Indian behaviors including that an Indian woman who is raped is expected to seek a divorce to free her husband, and that a wife is expected to throw herself on her husband's funeral pyre. Respondent inquired of a student in the class who is apparently Indian, "Why would they do that? How can they be that stupid?"

Later in the lecture Respondent commented to a student, "I think you're crazy, but I love you anyway. My love is unconditional."

8. The lectures of January 19, 1990, and January 22–23, 1990 were tape recorded with the full knowledge of Respondent and are available for review. During these lectures Respondent refers to "anal compulsive" students. During the January 22, 1990 lecture Respondent posed the following question to a female student (soliciting an answer), "If your husband asked you to cook breakfast for him in the nude, would you?" During class on January 22, 1990 and on numerous other occasions Respondent addressed various female students as "Babe" and "Baby".

9. At approximately 2 p.m. on January 23, 1990, the husband of Complainant, Brian Braun, telephoned Respondent at home. The conversation lasted approximately 30 minutes and was civil. Braun expressed his concern to Respondent about the sexual content of his lectures and the personal inquiries being made of students. Respondent was occasionally defensive, but always polite and responsive during the conversation. Respondent admitted each incident about which he was questioned had occurred; but either justified each, attempted to explain its context or his motive in offering it. Braun suggested to Respondent that his real motive might be to "throw out a fishing line to see who might be interested in taking the bait." Respondent offered that most students enjoyed his banter and that Respondent thought only one or two students might be offended. Braun said that this made the offense no less serious—that Respondent ought to be concerned about any student who might be offended. The conversation ended with Respondent thanking Braun for the telephone call, and a promise from Respondent that he would alter his behavior. Braun promised the matter would go no further if Respondent did as he promised.

10. Respondent began his January 24, 1990 lecture by telling the class someone in class had made a complaint about Respondent during the previous week. The complaint allegedly objected to sexual references in Respondent's lectures. Respondent informed the class he had received a telephone call the previous afternoon "from a relative of a student" in which he had learned that his lectures were being taped for the purpose of this complaint. This identified Complainant to the class. Respondent told the class the complaints would require Respondent to alter his the content of his teaching. He said he would not be able to teach them about "teacher related stress, metacognition, tricks for teaching, Japanese education, humor, style of teaching" as a result of the complaints. He turned in the direction of the Complainant and "assured" her he was not angry and her grade would not be affected. He told her her grade would not suffer in any way, and the tests would remain in the same format as he had discussed earlier. Students were visibly upset. Several students began crying. One student left class. Students wanted to know why Complainant did not switch sections. Respondent said, "Well, for whatever reason . . .", and began to lecture, ignoring the concerns of the students. At one point, he had to stop lecturing because one student was crying uncontrollably. He inquired as to the reason for her distress. She replied she was very upset, that she didn't want to be in class anyway and "now everything was going to change". Respondent told her not to cry and begged her not to leave. He promised he would try to make her feel better. He was interrupted

a second time by another student who wanted to know why he refused to discuss the matter. She explained she did not think it was fair of him to refuse to consult with the other students in the class. He said he appreciated her concerns but he needed to get on with it. He expressed grave concern over the student who left the class. He asked where he might find her. "Where would she have gone?", he asked. He got information from other students on how he might find her later. He said he missed her, and was very worried about her. Complainant sat very still, in fear the class might retaliate at any moment. For the next several days Complainant had to listen to peers express their anger for her having caused Respondent to have eliminated such interesting topics from the curriculum. During the January 24, 1990 lecture, Respondent first raised the subject of a project. Respondent had not previously mentioned a project and several students brought that to his attention. Respondent claimed he had previously assigned the project and proceeded to explain the terms of the assignment. The project appeared to be retaliatory for the complaints. Students in the class were unhappy about the new assignment and later expressed anger because they believed it to be caused by Complainant.

Since January 24, 1990, Respondent has used far fewer sexual examples than previously. He has, however, often stopped short in various lecture situations and offered, for example: "suppose (student) went into a bar— oops, church ..." Other students in the class have been applauded and praised by Respondent for having made reference to the fact women do not stand still for injustice and do not let the desires of a few speak for the majority. Respondent had encouraged this kind of response from students and, as a result, has made the classroom environment hostile for Complainant.

11. This formal grievance is filed as a result of Respondent's retaliation and continuing egregious behaviors.

Respectfully submitted:
Terre J. Braun
Grievant

The original of this formal grievance was filed with the Dean of the College of Education, David Pearson, on January 1990.

Copies of this formal grievance have been provided to:

Louis Rubin, Respondent

Stan Levy, Vice Chancellor for Student Affairs

Mary Lou O'Shaughnessey

Ken Anderson